**Andrew E. JOHNSON, et al., Plaintiffs,**

v.

**Sandra MORTHAM, etc.,
et al., Defendants.**

**No. TCA 94–40025–MMP.**

United States District Court,
N.D. Florida,
Tallahassee Division.

Nov. 20, 1995.

Gerald J. Sullivan, Jr., Sullivan & Boyd, Jacksonville, FL, for plaintiffs Andrew E. Johnson, Thomas S. Bloodworth, Charles Henry Bloodworth, III, Bill Boyer, Frances G. Brown, Robert T. Conner, Harold F. Davis, Arthur Wilson Devoe, Robert Ellison,

George Erdel, Paul Farley, Sue Hall, Hugh Milton Hays, Hugh Milton Hays, Sr., Carson Thomas Howes, Jr., Ron Jackson, Carolyn Janice Johnson, Coranell H. Johnson, Susan M. Lamb, Jim Lewis, Pat Mathis, Cynthia McKinney, Daniel McKinney, Jim Neill, Tommy Praeter, Charles Romero, Vicki T. Romero, Dana Wine.

George L. Waas, Attorney General's Office, Department of Legal Affairs, Tallahassee, FL, Brenda Wright, Pro Hac Vice, Jackqueline A. Berrien, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Gerald B. Curington, General Counsel, House of Representatives, Tallahassee, FL, for defendant Jim Smith, in His Official Capacity as Secretary of the State of Florida.

Stephen N. Zack, Pro Hac Vice, Miami, FL, Brenda Wright, Pro Hac Vice, Jackqueline A. Berrien, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Gerald B. Curington, General Counsel, House of Representatives, Tallahassee, FL, for Pat Thomas, in His Official Capacity as President of the Florida Senate.

Richard A. Hixson, Richard A. Hixson, P.A., Tallahassee, FL, Thomas R. Tedcastle, Florida House of Representatives, Tallahassee, FL, Stephen N. Zack, Pro Hac Vice, Miami, FL, Brenda Wright, Pro Hac Vice, Jackqueline A. Berrien, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Gerald B. Curington, B. Elaine New, General Counsel, House of Representatives, Tallahassee, FL, for defendant Bolley L. Johnson, in His Official Capacity as Speaker of Florida House of Representatives.

George L. Waas, Attorney General's Office, Department of Legal Affairs, Tallahassee, FL, for defendant Sandra Mortham, Florida Secretary of State.

Brenda Wright, Pro Hac Vice, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for intervenors-defendants Frank Cummings, Bishop, Samuel L. Green, Sr., Reverend, Leonard O'Neal, Glynell Presley, Mary Lawson Brown.

Rodney G. Gregory, Rodney G. Gregory, P.A., Jacksonville, FL, J. Gerald Hebert, Pro Hac Vice, J. Gerald Hebert, P.A., Alexandria, VA, for intervenor-defendant Corrine Brown, Congresswoman.

Charles G. Burr, Charles G. Burr, P.A., Tampa, FL, for intervenor-defendant Florida State Conference of NAACP Branches.

Before HATCHETT, Circuit Judge, PAUL, Chief District Judge, and VINSON, District Judge.

## ORDER

PAUL, Chief District Judge.

On October 19, 1995, the three-judge panel heard oral arguments on the following pending motions:

(1) Cummings movants' Motion to Intervene (doc. 11)—to which Plaintiffs had responded (docs. 19 & 74);

(2) Brown movants' Motion to Intervene (doc. 20)—Plaintiffs had filed a response (doc. 34)—to which Brown movants had replied (doc. 52), and affirmed (doc. 67);

(3) NAACP's Motion to Intervene (doc. 31);

(4) Plaintiffs' Motion to Strike Brown movants' Motion to Dismiss (doc. 75);

(5) Brown movants' Motion to Dismiss (doc. 68);

(6) Defendant Smith's Motion for Summary Judgment (doc. 5)—to which Plaintiffs had responded (doc. 8);

(7) Plaintiffs' Motion for Summary Judgment (doc. 26)—to which Defendants had responded (doc. 29);

(8) Plaintiffs' Supplemental Motion for Summary Judgment (doc. 64)—Defendants had filed responses (docs. 66 & 79)—to which Plaintiffs had replied (doc. 73); and

(9) Plaintiffs' Second Motion for Preliminary Injunction (doc. 77)—to which Defendants had responded (doc. 84).

All parties and proposed party-intervenors were represented at the hearing.

**BACKGROUND:**

This case has its genesis in the congressional redistricting that came in the aftermath of the 1990 federal decennial census. Florida's population had increased by over

three million persons between 1980 and 1990, entitling Florida to four additional members in the United States House of Representatives. As a result, Florida's congressional delegation increased from nineteen representatives to twenty-three.

On the opening day of the 1992 Florida legislative session, Miguel DeGrandy, a member of the Florida House of Representatives, joined other voters in filing a suit in the District Court for the Northern District of Florida that challenged the constitutionality of Florida's congressional and state legislative districts. *See DeGrandy v. Wetherell,* 794 F.Supp. 1076, 1080 (N.D.Fla.1992). The plaintiffs alleged that in light of Florida's history of discrimination against minorities and the lack of electoral success of minorities, the districts violated the Equal Protection Clause of the Fourteenth Amendment, and the Voting Rights Act of 1965. A three-judge panel, comprised of Circuit Judges Joseph Hatchett and District Judges William Stafford and Roger Vinson, was appointed to hear the plaintiffs' case. Mindful of the fast-approaching candidate qualification deadline and upcoming fall elections, the *DeGrandy* plaintiffs urged the panel to reapportion and redistrict the state in light of the results of the 1990 census. *Id.* at 1079–80.

The Florida Legislature ended its regular session without adopting either a redistricting or reapportionment plan[1]. In April, 1992, Governor Lawton Chiles called a special redistricting and reapportionment session of the Legislature pursuant to Article III, § 16, of the Florida Constitution. During the session, the Legislature adopted Senate Joint Resolution 2–G, a reapportionment plan for state legislative districts. However, the Legislature was unable to agree on a congressional redistricting plan. *Id.* at 1080.

At the same time, the *DeGrandy* case progressed and was consolidated with a similar lawsuit filed by the Florida State Conference

of the NAACP Branches and several African–American voters. A number of persons and organizations were also granted leave to intervene or act as amicus curiae. The panel appointed the Honorable C. Clyde Atkins, Senior United States District Judge for the Southern District of Florida, to serve as Special Master. The panel charged Senior Judge Atkins with the task of considering and evaluating redistricting and reapportionment plans for Florida. However, the panel stayed proceedings related to state reapportionment after the Supreme Court of Florida validated the Senate reapportionment plan. *Id.* at 1080–81.

The parties stipulated that Florida's existing congressional district lines were malapportioned. On April 30, 1992, the three judge panel found that the existing congressional districting plan was unconstitutional because it violated Article I, § 2 of the Constitution, the Equal Protection Clause of the Fourteenth Amendment, the one-person, one-vote principle, and the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. *Id.* at 1081, 1090.

On May 29, 1992, the three-judge panel adopted a congressional redistricting plan submitted to it upon the report and recommendation of Special Master Atkins. *Id.* at 1090. Judge Atkins recommended the panel adopt Plan 308, developed by Independent Expert Professor M. David Gelfand from key portions of other redistricting plans. *Id.* at 1087–88. Plan 308 created, among other things, two African–American majority districts (Districts 3 and 17), plus one influence African–American district (District 23)[2]. *Id.* at 1088. The panel adopted Plan 308 after noting that the state of Florida did not have a method of redistricting other than legislative passage of a congressional districting plan. *Id.* at 1090. The panel therefore designated Plan 308 as the "1992 Florida Redistricting Plan," and ordered the state of Florida "to conduct the 1992 congressional

---

1. The Florida Legislature must adopt a redistricting plan in the same manner as other laws. *See* Fla. Const. art. III, §§ 7, 8, 16.

2. District 3, located in fourteen northern and central Florida counties, has a total African–American population of 55 percent, voting age population of 50.6 percent, and registration of

50.6 percent. District 17, in Dade County, has a total African–American population of 58.4 percent, voting age population of 54 percent, and registration of 59.3 percent. District 23 has an African–American voter age population of 45.7 percent. *DeGrandy,* 794 F.Supp. at 1088.

elections *and congressional elections thereafter* in districts as shown by Plan 308." *Id.* (emphasis added). In accordance with the *DeGrandy* panel's mandate, the Florida Legislature later repealed the existing congressional districting plan. *See* 1993 Fla.Laws ch. 93–271, *repealing* Fla.Stat. §§ 8.001, 8.01, 8.011, 8.03, 8.061 (1982).

District Three, one of the two African–American majority districts created under the 1992 Florida Redistricting Plan, is an odd-shaped district[3]. On January 18, 1994, Plaintiffs filed suit pursuant to 28 U.S.C. § 1343, alleging that District Three violated their rights to equal protection under the Fourteenth Amendment (doc. 2). Plaintiffs include Andrew Johnson, an unsuccessful 1992 candidate for the District Three congressional seat, non-black residents of the District Three who have allegedly been relegated to minority voting status, and non-black residents of other Florida congressional districts which were purportedly created with the intent to separate voters by race. Defendants include Secretary of State Sandra Mortham[4], the leadership of the Florida legislature[5], and the United States, which was permitted to intervene as a party defendant (doc. 45).

Plaintiffs have not alleged that District Three violates the Voting Rights Act, nor have they claimed that the District represents an unconstitutional dilution of white voting strength. Rather, the crux of Plaintiffs' legal claims is that District Three is nothing more than a racial gerrymander because it unconstitutionally segregates voters on the basis of race in violation of the Equal Protection Clause, and that it is not narrowly tailored to further a compelling governmental interest. Plaintiffs may raise such a claim under the authority of *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

On July 18, 1994, oral argument was heard on all pending motions (*see* July 18, 1994 Hr'g Tr., doc. 55). At the time, these motions included Defendant Smith's motion to dismiss or alternative motion for summary judgment (doc. 5), the various motions to intervene (docs. 11, 20, 31), and Plaintiffs' motions for summary judgment (doc. 26) and a preliminary injunction (doc. 32). Since that hearing, the panel has only ruled on Defendant Smith's motion to dismiss and Plaintiffs' motion for a preliminary injunction.

In July, 1994, Plaintiffs had moved for a preliminary injunction to enjoin the use of the *DeGrandy* panel's redistricting plan for the 1994 congressional election (doc. 32). However, that motion was denied by the panel because an injunction would have disrupted the 1994 congressional election. Specifically, the qualifying period for candidates had ended, the candidates had begun to organize their campaigns, to raise funds, and "to spend those funds in reliance on the present districting scheme." As a result, the panel found that the public interest would not be served by such an injunction (doc. 47 at 3).

In an order dated August 31, 1994, the panel also denied Defendant Smith's motion to dismiss (doc. 5). The majority held that Plaintiffs stated a claim under *Shaw.* The majority rejected Defendant's contention that the claim was barred under the doctrine of collateral estoppel because the issue of whether District Three was an unconstitutional gerrymander under *Shaw* had not been actually raised, litigated, or adjudicated in *DeGrandy.* Furthermore, the majority reasoned that state action existed because although Plan 308 was adopted by the *DeGrandy* court, it necessarily involved participation of state agencies in the conduct of actual elections. Finally, the majority held that they were not applying *Shaw* retroactively because the Plaintiffs' claimed viola-

---

**3.** A map of Florida's Third Congressional District is provided as Appendix A to this opinion.

**4.** Secretary Mortham was substituted for former Secretary Jim Smith, one of the original party defendants, pursuant to the panel's order of September 16, 1995 (doc. 86).

**5.** Peter R. Wallace, Speaker of the Florida House of Representatives, was substituted for former

Speaker of the Florida House Bolley L. Johnson, one of the original party defendants, pursuant to the panel's order of September 7, 1995 (doc. 83).

The parties have stipulated that the action against the Legislature should be abated until the panel makes a ruling on the constitutionality of District Three (*see* doc. 18).

tions were current and ongoing (doc. 57). Circuit Judge Hatchett dissented from the majority's holding (*Id.* at 11–14).

On March 31, 1995, Judge Stafford recused himself from the panel (doc. 60). Chief Circuit Judge Tjoflat then appointed Chief District Judge Maurice Paul to the panel as the requesting judge (doc. 62).

On June 29, 1995, the United States Supreme Court issued its rulings in *Miller v. Johnson,* 514 U.S. ——, ——, 115 S.Ct. 2475, 2485, 132 L.Ed.2d 762 (1995), and *United States v. Hays,* 514 U.S. ——, —— —— ——, 115 S.Ct. 2431, 2436–37, 132 L.Ed.2d 635 (1995), cases involving equal protection challenges under *Shaw* to congressional redistricting plans in Georgia and Louisiana, respectively. Plaintiffs filed renewed motions for summary judgment (doc. 64) and a preliminary injunction (doc. 77), relying on the authority of these two cases. The panel then set this cause for a hearing on all pending motions (doc. 78). Each of these pending motions will be discussed in turn.

## DISCUSSION:

### I. Motions to Intervene:

The proposed intervenors seek to intervene in this lawsuit to preserve the existing congressional districting plan as adopted in *DeGrandy.* The movants contend they may intervene as of right pursuant to Rule 24(a), Federal Rules of Civil Procedure, or alternatively, seek permissive intervention pursuant to Rule 24(b), Federal Rules of Civil Procedure.

The Plaintiffs oppose all three motions to intervene. The Plaintiffs point out that they do not seek, nor could they receive, any relief from the movants who seek to intervene as defendants. The Plaintiffs contend that the state is the only proper party to defend a constitutional challenge to Florida's congressional districts because only the state has the authority to draw and enforce a districting plan. Plaintiffs argue that the proposed in-

tervenors lack the requisite legally cognizable interest to entitle them to intervene in this action.

■■■ A proposed intervenor shall be permitted to intervene as of right in an action: (1) upon timely application; (2) when the applicant has a direct, substantial, and legally protectable interest in the litigation [6]; and (3) existing parties to the lawsuit will not adequately represent the applicant's interest. *See, e.g.,* Fed.R.Civ.P. 24(a); *Thornburgh,* 865 F.2d at 1213 (citations omitted). Once these prerequisites to intervention are established, the court has no discretion to deny the motion. *United States v. Georgia,* 19 F.3d 1388, 1393 (11th Cir.1994) (per curiam).

■■■ A proposed intervenor may also be permitted to intervene in an action: (1) upon timely application; and (2) when the applicant's claim or defense and the main action have a common question of law or fact. Fed. R.Civ.P. 24(b); *Thornburgh,* 865 F.2d at 1213. A number of other factors are relevant to whether permissive intervention should be granted. For example, a court must consider whether the intervention will "unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R.Civ.P. 24(b). Furthermore, it is relevant whether the proposed intervenor has standing to assert a protected interest at issue in the suit. *See Thornburgh,* 865 F.2d at 1212–13. In addition, a court should evaluate whether the movant's interests are adequately represented by existing parties. *Venegas v. Skaggs,* 867 F.2d 527, 530–31 (9th Cir. 1989), *aff'd on other grounds,* 495 U.S. 82, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990). Finally, judicial economy is a relevant consideration. *Id.; Bush v. Viterna,* 740 F.2d 350, 359 (5th Cir.1984) (per curiam).

There is no question that all the proposed intervenors have timely applied for interven-

---

**6.** The Supreme Court has noted that case law is unclear the extent to which a "legally protectable interest" requires compliance with not only the requirements of Rule 24(a), but also the standing requirements of Article III. *See Diamond v. Charles,* 476 U.S. 54, 68–69, 106 S.Ct. 1697, 1706–07, 90 L.Ed.2d 48 (1986). However, the Eleventh Circuit has held that an applicant seeking to intervene must only meet the requirements

of Rule 24. *Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir.1989). Nevertheless, standing is relevant to the inquiry of whether a proposed intervenor has a sufficient interest, *id.,* and a movant who shows standing has a sufficiently substantial interest to intervene. *Howard v. McLucas,* 782 F.2d 956, 959 (11th Cir.1986), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989).

tion. Consequently, resolution of the motions to intervene turns on whether the other requirements of Rule 24 have been demonstrated.

## A. The Cummings Movants:

The Cummings movants include African–American voters who reside in majority African–American congressional districts and other congressional districts created by the three judge panel in *DeGrandy*, as well as three organizations, each purporting to represent large groups of African–American voters in Florida. Three of the individual Cummings movants were intervenors in *De-Grandy*. The Cummings movants claim a "direct and immediate interest in the congressional redistricting plan which this Court adopted for Florida" (doc. 11).

 Only some of the Cummings movants have a direct, substantial, and legally protectable interest in the litigation sufficient to entitle them to intervene as of right. Movants' counsel indicated that the following individuals are registered to vote in the Third Congressional District: Bishop Frank Cummings, Mary Lawson Brown, the Reverand Samuel L. Green, Sr., Leonard O'Neal, and Glynell Presley. Registered voters have standing, and a sufficiently substantial interest to intervene, in an action challenging the voting district in which the voters are registered. *Meek v. Metropolitan Dade County, Fla.,* 985 F.2d 1471, 1480 (11th Cir.1993) (per curiam); *League of United Latin Am. Citizens, Council No. 4434 v. Clements ("LULAC II"),* 999 F.2d 831, 845 (5th Cir.1993) (en banc) (judges had standing as voters in county to intervene in action challenging judicial elections in that county), *cert. denied,* ——— U.S. ———, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994); *see also Miller v. Johnson,* 514 U.S. ———, ———, 115 S.Ct. 2475, 2485, 132 L.Ed.2d 762 (1995) (residents of challenged voting district had standing to bring equal protection challenge to redistricting that resulted in

creation of the district). Consequently, the above-mentioned individuals are granted leave to intervene as of right.

 The remaining individuals [7] are registered to vote in other congressional districts that are not the subject of the Plaintiffs' constitutional challenge. The Supreme Court recently held that voters living in districts other than the district that is the primary focus of a racial gerrymandering claim, lack standing to bring a lawsuit. *See United States v. Hays,* 514 U.S. ———, ——— ———, 115 S.Ct. 2431, 2436–37, 132 L.Ed.2d 635 (1995). The fact that voters from other congressional districts lack standing is relevant to whether they have sufficient protectable interests to intervene. *Thornburgh,* 865 F.2d at 1212–13. Although the Cummings movants residing outside the Third Congressional District might have a stake in maintaining the redistricting plan adopted by *DeGrandy* in order to preserve their own districts, this stake is a generalized interest that does not rise to level of a direct, substantial, and legally protectable interest in this litigation [8]. *See McLucas,* 782 F.2d at 959; *see generally ManaSota–88, Inc. v. Tidwell,* 896 F.2d 1318, 1323 (11th Cir.1990) (mere fact that a movant may be disadvantaged by potential stare decisis effect of decision does not automatically warrant granting movant's application to intervene as of right). As a result, these individuals are not entitled to intervene as of right.

 Furthermore, the individual movants residing outside District Three will not be allowed to permissively intervene. In sum, their goals and defenses in this litigation overlap with those of other defendants and defendant-intervenors. However, these individuals have not shown that the other defendants will be unable to adequately represent their interests. Where an existing party pursues the same ultimate objective as an applicant seeking intervention, the proposed intervenor's interest is presumed to be ade-

---

7. Gerald Adams, Wilmateen W. Chandler, Cynthia Larramore, Carolyn Williams, and Chiquita Williams.

8. Indeed, it is somewhat disingenuous that, under the authority of *Hays*, the congressional movants have moved to dismiss certain plaintiffs who

allegedly reside outside the Third Congressional District (doc. 68), while many of those voters and congressional representatives seeking to intervene as defendants also reside outside the Third Congressional District.

quately represented. *FSLIC v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 215 (11th Cir.1993)[9]. It is therefore unlikely these individuals would raise any substantive defenses beyond those raised by the other defendants and defendant-intervenors. Moreover, allowing these individuals to intervene will not further the interests of judicial economy.

■ Three organizations have also moved to intervene[10]. These organizations have a protectable legal interest in this litigation, to the extent they represent voters within the Third District[11]. However, the three organizations have completely failed to demonstrate inadequacy of representation by any of the defendants or the defendant-intervenors. Having failed to rebut the presumption of adequate representation, these organizations cannot intervene pursuant to Rule 24(a). *Falls Chase*, 983 F.2d at 215–16. Permissive intervention under Rule 24(b) is also inappropriate, for the same reasons that the individual movants residing outside District Three are not entitled to such intervention.

Accordingly, the motion to intervene by the Cummings movants (doc. 11) is GRANTED IN PART. The following individuals are granted leave to intervene as of right pursuant to Fed.R.Civ.P. 24(a): Bishop Frank Cummings, Mary Lawson Brown, the Reverand Samuel L. Green, Sr., Leonard O'Neal, and Glynell Presley.

### B. The Congressional Movants:

The congressional movants include the three incumbent African–American members of Congress from Florida, Corrine Brown, Alcee Hastings, and Carrie Meek. Congresswoman Brown is the representative from the Third Congressional District, and was an intervenor in *DeGrandy*. Congressman Hastings represents the Twenty–Third Congressional District, an African–American influence district created under *DeGrandy*. Congresswoman Meek represents the Seventeenth Congressional District, a majority African–American district created under *DeGrandy*. The congressional movants claim "a direct interest in protecting the benefits of this representation which have been provided to them individually and to the citizens whom they represent, and in assuring that their opportunities to engage in coalition-building ... continues with all deliberate speed" (doc. 21 at 8–9).

A member of Congress, like any other applicant, is subject to the requirements for intervention delineated in Rule 24. *Cf. Thornburgh*, 865 F.2d at 1205–08 (a member of Congress is subject to constitutional requirements of standing); *Boehner v. Anderson*, 30 F.3d 156, 159–60 (D.C.Cir.1994) (same). A review of the congressional movants' motion to intervene reveals that only

---

9. Proposed intervenors have a minimal burden to show that their interests may be inadequately represented, notwithstanding the existing party's common goal. *Falls Chase*, 983 F.2d at 216. Generally, to overcome the presumption of adequate representation, the applicant must show any of the following: (1) collusion between the representative and an opposing party; (2) the representative has or represents an interest adverse to the proposed intervenor; or (3) that the representative has failed in fulfillment of its duty. *Id.* at 215 (citations omitted). The Cummings movants residing outside District Three have not made such a showing.

10. These organizations include The African American Political Action Network of Florida, the National Political Caucus of Black Women, Tallahassee Chapter, and Blacks on the Serious Side, Inc.

11. *See generally Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342–44, 97 S.Ct. 2434, 2441–42, 53 L.Ed.2d 383 (1977). An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id.* at 343, 97 S.Ct. at 2441. Members of an association who reside within the Third Congressional District have standing in their own right as defendants, and otherwise have a legally protectable interest. *See Meek*, 985 F.2d at 1480; *LULAC II*, 999 F.2d at 845; *see also Miller*, —— U.S. at ——, 115 S.Ct. at 2485. The interest in maintaining the African–American majority District Three is germane to the purpose of each of the three Cummings organizations. Finally, the defenses asserted by the three organizations do not require the partic-

Congresswoman Brown meets the requirements of Rule 24.

 Congresswoman Brown, whose congressional district is being challenged in the case at bar, is entitled to intervene as of right. First, she has a direct, substantial, and legally protectable interest in the litigation. Elected officials have personal interests in their office sufficient to give them standing when the district they represent is subject to a constitutional challenge. *See League of United Latin Am. Citizens, Council No. 4434 v. Clements ("LULAC I "),* 884 F.2d 185, 188 (5th Cir.1989); *Williams v. State Bd. of Elections,* 696 F.Supp. 1563, 1569–73 (N.D.Ill.1988). Second, although she might be adequately represented by the United States—demonstrated through the inclusion of her declaration in the Government's recent memorandum of law (*see* Defs.' Ex. A to doc. 79)—she has a personal interest in her office that goes beyond the more general interest that she and the Government have in keeping District Three intact. Consequently, Congresswoman Brown. is granted leave to intervene pursuant to Fed. R.Civ.P. 24(a).

 On the other hand, the remaining two congressional movants may not intervene as defendants. The Seventeenth and Twenty–Third Congressional Districts are not the subject of a constitutional challenge in the case sub judice. Undoubtedly, a finding by the panel that the Third Congressional District is the product of unconstitutional gerrymandering would necessarily require the Florida Legislature to adopt a redistricting plan that would effectively abrogate the *De-Grandy* plan—and might even result in the redrawing of Congressman Hastings' and Congresswoman Meek's districts. Nevertheless, Congressman Hastings and Congresswoman Meek have no more than a generalized interest in this litigation, since their districts are not being challenged and the possibility of a remedy that would impair their interests in their congressional seats is no more than speculative[12]. *See McLucas,* 782 F.2d at 959.

In conclusion, the motion to intervene by the congressional movants (doc. 20) is GRANTED IN PART. The motion is granted to the extent that Congresswoman Corrine Brown may intervene as of right pursuant to Fed.R.Civ.P. 24(a).

## C. NAACP:

Finally, the NAACP has moved to intervene. The NAACP purports to represent "thousands" of African–American Florida voters, including voters in District Three. The NAACP participated in *DeGrandy,* and provided portions of the congressional redistricting plan adopted by the *DeGrandy* panel. The NAACP claims "an interest in assuring that Florida retains this minority representation so as to remedy the prior unlawful dilution of African–American voting strength and to assure that Florida's congressional districts comply with federal law" (doc. 31 at 3).

The NAACP cannot intervene as of right. The NAACP has a protectable legal interest in this litigation, to the extent the NAACP represents voters within the Third District[13]. However, the NAACP has completely failed to demonstrate inadequacy of representation by any of the defendants or defendant-intervenors. Having failed to rebut the presumption of adequate representation, the NAACP cannot intervene pursuant to Rule 24(a). *Falls Chase,* 983 F.2d at 215–16.

 Nevertheless, the NAACP is granted leave to permissively intervene. In *De-Grandy,* the NAACP submitted a redistricting plan that substantially influenced the Special Master in the creation of Plan 308 and District Three. *See* 794 F.Supp. at 1086–88. Participation of the NAACP in this action will therefore aid the Court in its constitutional inquiry concerning District Three, and thereby promote the interests of judicial economy. The NAACP also brings a unique perspective to the case, and has been allowed to intervene in similar actions around

---

ipation of individual members of these organizations.

**12.** This conclusion is further supported by the fact that voters within the Seventeenth and Twenty–Third Congressional Districts would lack a legally protectable interest sufficient to challenge or defend the Third Congressional District. *See Hays,* 514 U.S. at ———, 115 S.Ct. at 2436–37; *see supra* discussion on the individual Cummings movants residing outside District Three.

**13.** *See supra* note 11.

the country. As a result, the NAACP's motion to intervene (doc. 31) is GRANTED.

## II. Plaintiffs' Motion to Strike (Doc. 75):

Plaintiffs move to strike (doc. 75) the Brown movants' motion to dismiss (doc. 68) on the grounds that the Brown movants have not been permitted to intervene in this action as party defendants, and therefore lack standing to file the motion. However, having permitted Congresswoman Corrine Brown to intervene as a party defendant, Plaintiffs' motion to strike is DENIED.

## III. Corrine Brown's Motion to Dismiss (Doc. 68):

Corrine Brown moves to dismiss the complaint (doc. 68) on two separate grounds. First, Brown asserts that several of the plaintiffs are not residents of Florida's Third Congressional District, and therefore lack standing to maintain their constitutional claims against Defendants. Second, Brown asserts that the remaining plaintiffs have failed to state a claim under *Shaw v. Reno*, and therefore have not sustained an injury in fact or individualized harm sufficient to give them standing to prosecute this action. Accordingly, Brown concludes that this cause should be dismissed with prejudice.

A complaint is not to be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). "[I]n reviewing the sufficiency of a complaint in the context of a motion to dismiss [the panel must] ... treat all of the well-pleaded allegations of the complaint as true," *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977), and must draw all inferences from those facts in the light most favorable to the plaintiff, *e.g., Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir.1993).

In order to have constitutional standing, the Plaintiffs must meet three requirements. First, they must have suffered an "injury in fact"—in other words, violation of a "legally protected interest which is (a) concrete and

particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Hays*, 514 U.S. at ——, 115 S.Ct. at 2435 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)).

Plaintiffs agree with Defendants that only the following individual plaintiffs are registered voters in the Third Congressional District: Coranell H. Johnson, Charles Romero, Vicki T. Romero, Harold F. Davis, Arthur Wilson Devoe, George Erdel, Carson Thomas Howes, Jr., and Jim Neill (*see* Stafford aff., doc. 88). Brown's grounds for dismissal as to these plaintiffs are completely without merit.

As residents of the Third Congressional District, the eight plaintiffs listed above have standing to prosecute the case at bar. *See Miller*, —— U.S. at ——, 115 S.Ct. at 2485; *Hays*, 514 U.S. at ——, 115 S.Ct. at 2436. In *Hays*, the Supreme Court discussed the individualized harm suffered by a plaintiff residing in a racially gerrymandered district, finding that

> ... the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action. Voters in such districts may suffer the special representational harms racial classifications can cause in the voting context.

*Id.* (internal citations omitted). Brown's arguments, some of which have been previously disposed of by the panel [14], largely go to the merits of Plaintiffs' equal protection claims. However, by drawing all inferences from the complaint in the light most favorable to the Plaintiffs, *e.g., Duke*, 5 F.3d at 1402, the plaintiffs residing in District Three have shown an injury in fact, causation between their injury and the alleged unconstitutional conduct, and that their injury can be cured by a favorable decision by this panel.

Plaintiffs also argue that Andrew Johnson, an unsuccessful candidate for the Third Dis-

14. A copy of the August 31, 1994, order (doc. 57) is provided as Appendix B to this opinion.

trict's seat in the 1992 congressional elections, has standing. Mr. Johnson is not a resident of the Third District, but is a registered voter in the State of Florida. Plaintiffs contend that District Three's bizarre shape and the public perception that the District should be represented by an African–American, have prevented Johnson and other white congressional candidates from being elected in the District (*see* Johnson Aff., doc. 76).

Although Mr. Johnson is not a resident of District Three, the Qualifications Clause of the Constitution only requires that a Representative be an "Inhabitant of that State in which he shall be chosen." U.S. Const. art. I, § 2, cl. 2; *see generally U.S. Term Limits, Inc. v. Thornton,* 514 U.S. ——, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (neither Congress nor the States may impose qualifications for United States Representative beyond those set forth in the Qualifications Clause of the Constitution). Any requirement that a congressional candidate must be a resident of the congressional district in which he seeks election, would be an additional qualification that is void under the Constitution. *Hellmann v. Collier,* 217 Md. 93, 141 A.2d 908, 911–12 (1958). Since Andrew Johnson is qualified to serve as the Representative from the Third Congressional District [15], and he has alleged an abridgment of his right to run for such office through racial gerrymandering, he has standing to bring the instant action [16]. *See Hays,* 514 U.S. at ——, 115 S.Ct. at 2435.

▮ Plaintiffs further argue that Robert Ellison, the treasurer of United We Stand America ("UWSA") for the Third Congressional District, has standing. While Mr. Ellison himself is not a resident of District Three, members of the association he represents are (*see* Ellison Aff., doc. 88). An association

> may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties.

*Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975); *see supra* note 11. Plaintiffs contend that the bizarre shape of District Three has prevented UWSA from effectively organizing itself within the District, giving it standing to sue in its own right. In addition, Plaintiffs maintain that the bizarre shape of District Three has inhibited association between members and persons interested in UWSA who reside within the Third District. Drawing all inferences in favor of the Plaintiffs, *e.g., Duke,* 5 F.3d at 1402, Mr. Ellison has standing in his capacity as an official of UWSA to raise both of these claims. *See Hays,* 514 U.S. at ——, 115 S.Ct. at 2435.

Finally, Plaintiffs do not deny that those individuals residing outside District Three lack standing to bring this action. *See Hays,* at —— – ——, 115 S.Ct. at 2436–37. Consequently, the following plaintiffs who reside outside the Third Congressional District lack standing, and are dismissed: Thomas S. Bloodworth, Charles Henry Bloodworth, III, Bill Boyer, Frances Brown, Robert T. Connor, Paul Farley, Hugh Milton Hays, Jr., Ron Jackson, Carolyn Janice Johnson, Susan M. Lamb, Pat Mathis, Cynthia McKinney, and Daniel McKinney.

For all the afore-mentioned reasons, Defendant–Intervenor Brown's motion to dismiss (doc. 68) is GRANTED IN PART.

## IV. Defendant Smith's Motion For Summary Judgment (Doc. 5):

At the same time Defendant Smith moved to dismiss, he filed an alternative motion for summary judgment (doc. 5). However, Smith failed to present supporting evidence

---

**15.** Namely, he is a resident of the State of Florida, is twenty-five years or older, and has been a citizen of the United States at least seven years. *See* U.S. Const. art. I, § 2, cl. 2.

**16.** *See generally Briggs v. Ohio Elections Comm'n,* 61 F.3d 487, 491–93 (6th Cir.1995) (unsuccessful candidate had standing to raise

First Amendment claim where she was contemplating running for office in the future); *La Porte County Republican Cent. Comm. v. Board of Comm'r of La Porte County,* 43 F.3d 1126, 1129 (7th Cir.1994) (redrawing districts for purpose of curtailing ability of certain candidates to be elected may violate Constitution).

showing that no material question of fact remained on Plaintiffs' claims. As a result, the panel's reasoning in its order denying Smith's motion to dismiss (*see* doc. 57) is equally applicable here. Accordingly, Defendant Smith's motion is DENIED.

## V. Plaintiffs' Motion For Summary Judgment (Docs. 26 & 64):

In July, 1994, Plaintiffs moved for summary judgment (doc. 26). In July, 1995, Plaintiffs filed a renewed motion for summary judgment (doc. 64). Plaintiffs have filed supplemental authority, affidavits, and other documents in support of their motions (docs. 53–54, 76, & 87). Defendants have filed responses and documents in opposition to Plaintiffs' motion (docs. 29, 66, & 79). Plaintiffs have filed a reply brief to Defendants' responses (doc. 73).

In evaluating a motion for summary judgment, the panel must examine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). If the party opposing a motion for summary judgment bears the burden of proof on a dispositive issue, the burden on the moving party is to demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corporation v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If this occurs, the party upon whom the burden of proof is imposed then must come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof. *Anderson v. Liberty Lobby,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). However, "the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor." *WSB–TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir.1988).

Plaintiffs raise several different grounds for summary judgment, which are dealt with separately below.

### A. *DeGrandy* Panel's Jurisdiction:

Plaintiffs first argue they are entitled to summary judgment because the *DeGrandy* panel lacked subject matter jurisdiction over the plaintiffs' claims. Plaintiffs maintain that pursuant to 28 U.S.C. § 2284, three-judge courts may only address "the constitutionality of the apportionment of congressional districts," and not the constitutionality of a redistricting plan. Plaintiffs further contend that even if a three-judge court could entertain such a claim, the court's imposition of a congressional redistricting plan would violate the principle of separation of powers (doc. 26 at 12–17).

Lack of subject matter jurisdiction may be raised at any time, even after the court has rendered a decision on the merits. *Casio, Inc. v. S.M. & R. Co., Inc.,* 755 F.2d 528, 530 (7th Cir.1985); *see* Fed. R.Civ.P. 12(h)(3); *Save the Bay, Inc. v. United States Army,* 639 F.2d 1100, 1102 (5th Cir.1981)[17]. Nevertheless, Plaintiffs' arguments that the *DeGrandy* panel lacked subject matter jurisdiction are without merit. Constitutional challenges to congressional redistricting plans clearly fall within the scope of 28 U.S.C. § 2284. *See, e.g., Ohio ex rel. Williams v. Lambros,* 512 F.2d 372 (6th Cir. 1975); *Shayer v. Kirkpatrick,* 541 F.Supp. 922 (D.Mo.), *aff'd,* 456 U.S. 966, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982). Moreover, if a three-judge court exercising jurisdiction under 28 U.S.C. § 2284 strikes down a congressional districting plan and the legislature is unable to adopt a new redistricting plan, then the court may impose its own plan. *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978).

### B. Time Frame For Court Redistricting Plan:

Plaintiffs next assert that court-ordered redistricting is a temporary solution applied when the state legislature has insuffi-

---

**17.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

cient time to enact a new redistricting plan before impending elections. Plaintiffs maintain that after the impending elections are completed, the state legislature should be given the opportunity to adopt a new redistricting plan. However, Plaintiffs contend that the Florida Legislature was prevented from enacting a replacement plan by paragraph 2 of the *DeGrandy* court's judgment. Paragraph 2 adopted Plan 308 as the permanent decennial redistricting plan for the state of Florida, and ordered the state of Florida "to conduct the 1992 congressional elections *and congressional elections thereafter* in districts as shown by Plan 308." *DeGrandy*, 794 F.Supp. at 1090 (emphasis added). Plaintiffs conclude that the *DeGrandy* panel's adoption of a permanent redistricting plan violates the constitutional principle of separation of powers.

▪ The parties raised several different ways in which the instant three-judge panel can consider arguments pertaining to the time frame of the *DeGrandy* redistricting plan. It is clear that a motion to alter or amend judgment pursuant to Fed.R.Civ.P. 52(b) or 59(e) cannot be entertained, since none of the *DeGrandy* parties raised such a

motion within ten days after entry of judgment. However, to the extent that some of the parties in this action were parties in the *DeGrandy* action, those parties might be able to raise such a motion pursuant to Fed. R.Civ.P. 60(b)(5), which gives a court the inherent power to modify the prospective effect of a permanent injunction[18]. In the alternative, the *DeGrandy* parties might seek an amendment under Rule 60(b)(6), which provides for relief from a final judgment on the grounds of "any other reason justifying" the relief[19].

The Court finds that the more appropriate analytical route to take is by treating Plaintiffs' arguments as an independent attack on the *DeGrandy* redistricting plan. It is debatable whether this panel, which now includes Chief District Judge Paul in place of District Judge Stafford, constitutes the *DeGrandy* court. On the other hand, the instant three-judge panel has jurisdiction to entertain constitutional challenges to any portion of the *DeGrandy* redistricting plan. *See* 28 U.S.C. § 2284. Plaintiffs have challenged the *DeGrandy* court's imposition of a permanent state redistricting plan[20], and this

---

**18.** A court has the inherent equitable power to modify the prospective effect of its decrees in response to changed circumstances, or when there has been a significant change in or interpretation of controlling decisional law. *Roberts v. St. Regis Paper Co.*, 653 F.2d 166, 172 (5th Cir. Unit B Aug. 1981); *see, e.g., United States v. Georgia Power Co.*, 634 F.2d 929, 932–34 (5th Cir. Jan. 1981), *vacated and remanded on other grounds*, 456 U.S. 952, 102 S.Ct. 2026, 72 L.Ed.2d 477 (1982).

**19.** Unlike Rules 60(b)(1)–(3), a Rule 60(b)(6) motion need not be raised within one year after imposition of a final judgment. *See* Fed.R.Civ.P. 60(b). Mistakes of law by judges may be amended under Rule 60(b), which provides a "grand reservoir of equitable power to do justice in a particular case." *Nisson v. Lundy*, 975 F.2d 802, 806 (11th Cir.1992) (citations omitted). "[W]here a district court's mistake was 'clear on the record' and involved a 'plain misconstruction' of the law ..., compelling policies of basic fairness and equity reflected by 60(b)' may mandate amendment to 'conform its judgment to the law.'" *Id.* (citations omitted). Nevertheless, relief under 60(b)(6) is an extraordinary remedy that may only be invoked under exceptional circumstances. *Cavaliere v. Allstate Ins. Co.*, 996 F.2d 1111, 1115 (11th Cir.1993).

**20.** While Plaintiffs did not expressly challenge the permanence of the *DeGrandy* plan in their complaint (*see* doc. 2), they have raised such a challenge in their motions for summary judgment (doc. 26 at 8; doc. 64 at 5), which should be treated as a motion to amend their complaint. This Court has substantial discretion in allowing parties to amend their pleadings, and leave to amend is to "be freely given when justice so requires." Fed.R.Civ.P. 15(a).

Judge Hatchett, in his dissent, erroneously concludes that this issue is not before the Court, notwithstanding his concession that "... the rest of the plaintiffs' language certainly opines that the *DeGrandy* court exceeded its authority in rendering its injunction ..." The record evidence demonstrates that Plaintiffs have consistently attacked the constitutionality of a permanent court-drawn redistricting plan. For example, in their original summary judgment motion, Plaintiffs argued that to the extent the *DeGrandy* court adopted a permanent redistricting plan,

... *the court appears to have deviated from the limited authority to create court-drawn redistricting plans set out by the Supreme Court.* It has also violated the principle of the separation of powers and has prevented the Florida Legislature from fulfilling its obligations under Article III, Section 3 of the Florida Constitution to

panel may properly consider such a challenge.

The Florida Legislature is required to redistrict its congressional districts after each decennial census. *See* U.S. Const. art. I, § 2, cl. 3, *as amended by* U.S. Const. amend. XIV, § 2 ("Representatives shall be apportioned among the several States according to their respective numbers"); U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."); *see also* 2 U.S.C. § 2a (providing the time and manner for redistricting). Redistricting is therefore a matter for state legislative consideration and determination. The Court emphasized the legislative nature of redistricting in *Wise v. Lipscomb:*

> When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.

437 U.S. at 540, 98 S.Ct. at 2497. Judicial relief is only appropriate "when a legislature

fails to [redistrict] according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds v. Sims,* 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964). In the wake of such a failure by the legislature, "a federal court is left with the unwelcome obligation of performing in the legislature's stead, while lacking the political authoritativeness that the legislature can bring to the task." *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977).

There is no question that the *DeGrandy* court properly adopted a redistricting plan for Florida for the 1992 congressional election. The three-judge panel struck down the existing congressional districting plan after the parties stipulated that the congressional district lines were malapportioned. 794 F.Supp. at 1081. The panel adopted a new congressional districting scheme only after the Florida Legislature failed to timely adopt a new redistricting plan, with the filing deadlines for the Fall, 1992 congressional election close at hand. *See id.*

Nevertheless, including the language "and congressional elections thereafter" in the injunction issued in *DeGrandy* appears to have had one of two results: Either the *DeGrandy* court actually designated Plan 308 as a per-

---

redistrict the State after the decennial census.....

Doc. 26 at 5 (emphasis added). Moreover, during oral arguments on Plaintiffs' motion, Mr. Sullivan, Plaintiffs' counsel, stated

> [w]e think that to narrowly tailor any remedy or to satisfy the third element of the *Milliken* test, this Court [the *DeGrandy* court] *would have to have made its congressional districting plan, Plan 308, an interim plan or a temporary plan;* and that, as soon as the congressional elections were completed in 1992, the legislature should have been permitted the opportunity to go back, and, as a matter of fact, should have been ordered to go back, and attempt to legislatively redraw the districts.
>
> And, consequently, that's what we are asking to happen here, is that the legislature ... has asked this Court for permission to redistrict the state of Florida, the congressional districts, in accordance with constitutional principles; and that they, therefore, should be granted that right because it is their responsibility under the Florida Constitution to do so. And I think that under the U.S. Constitution, it is this Court's responsibility to exercise all of its discretion in

allowing the legislative redistricting process to go forward whenever possible.

Oct. 19, 1995 Hr'g Tr., doc. 90 at 50–51 (emphasis added).

Judge Hatchett correctly recites language from the oral arguments in which Plaintiffs' counsel indicated that Plaintiffs were not asking the Court to simply amend the *DeGrandy* injunction (*see* doc. 90 at 116–17). However, contrary to Judge Hatchett's interpretation, Plaintiffs were not abandoning their attack on the constitutionality of a permanent court-ordered redistricting plan. Instead, as noted in the discussion in section V(C) of this order, Plaintiffs' counsel was merely emphasizing to the Court the importance of addressing the underlying issue of whether District Three survived a challenge under *Shaw*—even if the Court determined that the *DeGrandy* injunction exceeded constitutional constraints. *See* doc. 90 at 117 (to do otherwise "would ignore the fact that the plan, as it currently exists, is unconstitutional and would give solace to people who would believe that it can continue to hold elections according to an unconstitutional redistricting plan, and overlook the violations of the rights of the plaintiffs").

manent[21] redistricting plan for the State of Florida; or, alternatively, the Florida Legislature interpreted the *DeGrandy* order that way and was thereby discouraged from adopting its own permanent redistricting plan[22]. To the extent that the first result occurred, the *DeGrandy* plan is unconstitutional. To the extent the second result occurred, the law is clear that a state legislature always has the authority to redistrict or reapportion, subject to constitutional constraints.

Although there appears to be some authority that supports implementation of permanent redistricting plans by federal courts[23], the clear weight of authority is to the contrary. The Supreme Court went to great pains in *Wise* to point out that, under the circumstances discussed above, a federal court must "devise and impose a reapportionment plan *pending later legislative action.*" 437 U.S. at 540, 98 S.Ct. at 2497 (emphasis added); *see also Burns v. Richardson,* 384 U.S. 73, 85, 86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966) ("The State remains free to adopt other plans for apportionment, and the present interim plan will remain in effect no longer than is necessary to adopt a permanent plan."). Indeed, there are practical and constitutional reasons for the narrow scope of the court's remedial power. Practically speaking,

> a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality. The federal courts by contrast possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name.

*Connor v. Finch,* 431 U.S. at 414–15, 97 S.Ct. at 1833–34. Constitutionally speaking, a district court is precluded by the twin principles of the separation of powers and federalism[24]

**21.** It is clear that "permanent," in the context of reapportionment and redistricting, means until the next decennial census. *See Reynolds,* 377 U.S. at 583–84, 84 S.Ct. at 1393 (Decennial reapportionment the constitutional minimum required).

**22.** The Florida Legislature has indicated that it should be afforded an opportunity to devise an acceptable replacement plan if the present redistricting plan is struck down (*see* doc. 18 at ¶ 7). At both the July, 1994 and July, 1995 hearings, counsel for the Florida Legislature indicated that even if the Legislature wanted to adopt another redistricting plan, it would have to move this Court to amend the *DeGrandy* order to strike the language "and congressional elections thereafter" (July 18, 1994 Hr'g Tr., doc. 55 at 73; *see id.* at 69–75). It is therefore very likely that the Legislature has a good faith belief that Plan 308 was adopted by the *DeGrandy* court as a permanent redistricting plan.

**23.** *See Connor v. Coleman,* 425 U.S. 675, 96 S.Ct. 1814, 48 L.Ed.2d 295 (1976) (per curiam) (Supreme Court ordered district court to adopt "permanent" reapportionment plan for Mississippi Legislature); *Garza v. County of Los Angeles,* 918 F.2d 763 (9th Cir.1990) (upholding district court's adoption of permanent plan for county supervisor districts), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991); *see also Kimble v. County of Niagara,* 826 F.Supp. 664 (W.D.N.Y.1993) (district court adopted permanent plan for elections to county legislature upon parties' request).

None of these cases actually held that a district court has the power to adopt a permanent congressional redistricting plan. In *Connor,* the Supreme Court ordered the lower court to adopt a "permanent" reapportionment plan, but limited its application to the election of legislators in the 1979 quadrennial elections and any necessary special elections to be held in November, 1976. 425 U.S. at 679, 96 S.Ct. at 1816. The *Garza* redistricting plan, although permanent on its face, only applied to the 1990 county supervisor election. *See* 918 F.2d at 765. Furthermore, since the *Garza* plan was based upon results from the 1980 census, it would have been superseded for the 1992 election by results from the 1990 decennial census. *Kimble* was designated as a permanent plan only after the parties stipulated to such a designation. 826 F.Supp. at 671–72.

**24.** Separation of powers, which is fundamental to our system of government, does not arise from any provision of the Constitution, but because "behind the words of the constitutional provisions are postulates which limit and control." *Principality of Monaco v. Mississippi,* 292 U.S. 313, 323, 54 S.Ct. 745, 748, 78 L.Ed. 1282 (1934) (Holmes, C.J.). Under the doctrine of separation of powers, our government is composed of three separate but coequal branches. Consequently, "unless otherwise expressly provided or incidental to the powers conferred, ... the judiciary cannot exercise either executive or legislative power." *Springer v. Philippine Islands,* 277 U.S. 189, 201–02, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928). As James Madison noted in The Federalist No. 47, "[w]ere the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, and the judge would then be the legislator."

from usurping a state legislature's authority to adopt a constitutional redistricting plan. It is clear, in light of the foregoing, that if the *DeGrandy* court designated Plan 308 as the permanent redistricting plan for Florida, then it would violate both of these constitutional principles.

Therefore, the Plaintiffs' motion for summary judgment must be granted to the extent that it challenges the *DeGrandy* plan as a permanent state redistricting plan. We conclude that it must be, and is, an interim plan which will remain in effect only until the Florida Legislature adopts a valid congressional redistricting plan, or through the next decennial census, whichever first occurs.

## C. Racial Gerrymandering Under *Shaw v. Reno*:

While the discussion in section V(B) shows that the *DeGrandy* court could not constitutionally impose a permanent redistricting plan, that does not end this matter. The heart of Plaintiffs' claims is that District Three amounts to a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment (*see* doc. 2). If the Plaintiffs have in fact been denied equal protection by the manner in which District Three was drawn, then the Court's failure to address that issue would allow the constitutional deprivation to continue. This is partic-

ularly true in light of the Florida Legislature's failure to fulfill its constitutional duty to adopt a permanent redistricting plan[25]. It is therefore necessary to determine whether Plaintiffs have demonstrated they are entitled to summary judgment on their equal protection claims.

### 1. Legal Standards:

■ Plaintiffs' allegation that District Three is the product of "an effort to separate voters into different districts on the basis of race" (doc. 2 at ¶ 6) is a cognizable claim under the Equal Protection Clause. *See Shaw*, 509 U.S. at ——, 113 S.Ct. at 2824. The mere fact that District Three and the Florida redistricting plan were created by a federal court does not change this result, since federal judges are equally bound to follow the dictates of the Constitution[26]. The *Shaw* decision was handed down subsequent to the *DeGrandy* court's adoption of the redistricting plan. "Some courts have held that an intervening change in the law ... would justify readjudication of the constitutionality of a reapportionment [or redistricting] plan." *Wesch v. Folsom*, 6 F.3d 1465, 1472–73 (11th Cir.1993) (collecting cases), *cert. denied*, —— U.S. ——, 114 S.Ct. 696, 126 L.Ed.2d 663 (1994). As a result, the instant panel has an independent obligation to evaluate the constitutionality of District Three in light of *Shaw*[27].

---

The Constitution itself embodies the principle of federalism. *See* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people."); *see also Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S.Ct. 2395, 2399, 115 L.Ed.2d 410 (1991) ("The Constitution created a Federal Government of limited powers."). Federalism is based upon the belief that a diffusion of power between two governments, federal and state, will enhance the freedom of the people. *See Ashcroft*, 501 U.S. at 458–59, 111 S.Ct. at 2400; *see also New York v. United States*, 505 U.S. 144, 180, 112 S.Ct. 2408, 2431, 120 L.Ed.2d 120 (1992) ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'") (quoting *Coleman v. Thompson*, 501 U.S. 722, 759, 111 S.Ct. 2546, 2570, 115 L.Ed.2d 640 (1991) (Blackmun, J., dissenting)).

**25.** After the *DeGrandy* decision, the Florida Legislature failed to adopt a new redistricting plan

that would be effective beginning with the 1994 congressional elections. The Florida Legislature implicitly adopted the *DeGrandy* plan when it repealed the existing districting plan. *See* 1993 Fla.Laws ch. 93–271, *repealing* Fla.Stat. §§ 8.001, 8.01, 8.011, 8.03, 8.061 (1982).

**26.** To hold otherwise, as Judge Hatchett suggests in his dissent, would be akin to holding that the Equal Protection Clause of the Fourteenth Amendment does not apply to federal courts. The Court is unwilling to reach such a conclusion. *See Adamson v. Commissioner*, 745 F.2d 541, 546 (9th Cir.1984) ("Federal courts cannot countenance deliberate violations of basic constitutional rights. To do so would violate our judicial oath to uphold the Constitution of the United States.") (citing 28 U.S.C. § 453).

**27.** The law of this Circuit is equally clear that *DeGrandy* does not bar this action under the doctrine of res judicata. *See generally Parnell v. Rapides Parish Sch. Bd.*, 563 F.2d 180, 185 (5th Cir.1977) ("Faced with changing law, courts hearing questions of constitutional right cannot

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The *Shaw* court noted that "[l]aws that explicitly distinguish between individuals on racial grounds fall within the core of that prohibition." 509 U.S. at ——, 113 S.Ct. at 2824. The Court therefore held that a reapportionment or redistricting challenge could be made under the Equal Protection Clause

> by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification.

*Id.* at ——, 113 S.Ct. at 2828. Redistricting legislation so bizarre on its face that it is unexplainable on grounds other than race, will be treated like any other state laws that classify citizens on the basis of race: such legislation will not be upheld unless it is narrowly tailored to achieve a compelling state interest. *Id.* at ——, 113 S.Ct. at 2825–27.

The *Shaw* court went on to hold that proving a case of racial gerrymandering will vary, depending upon the facts of the case. "In some exceptional cases, a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to 'segregat[e] ... voters' on the basis of race." *Shaw*, 509 U.S. at ——, 113 S.Ct. at 2826 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 341, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960)). Other cases will be more difficult because "a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes." *Id.* (citing *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964)). Legitimate purposes sufficient to defeat a claim of racial gerrymandering may be shown through the application of traditional districting criteria such as compactness, contiguity, and respect for political subdivisions. *Shaw*, 509 U.S. at ——, 113 S.Ct. at 2827.

In *Miller v. Johnson*, —— U.S. at ——, 115 S.Ct. at 2475, the Supreme Court clarified the requirements for proving an equal protection challenge to a districting or reapportionment plan. The question before the *Miller* court was whether Georgia's Eleventh Congressional District was racially gerrymandered in violation of the Equal Protection Clause. *Id.* at ——, 115 S.Ct. at 2482. Georgia, which had been designated a covered jurisdiction under § 4(b) of the Voting Rights Act, had to obtain preclearance for its congressional redistricting plan. *Id.* at ——, 115 S.Ct. at 2483. The first two plans submitted by the Georgia Legislature for preclearance were rejected by the Justice Department because they only included two African–American majority districts. *Id.* at —— ——, 115 S.Ct. at 2483–84. In order to obtain preclearance, the Georgia Legislature finally submitted a plan that created three African–American majority districts. *Id.* at ——, 115 S.Ct. at 2484. The Justice Department gave preclearance, and elections were held under the new congressional districting plan in November, 1992. *Id.* at —— ——, 115 S.Ct. at 2484–85.

The Eleventh District was centered around large urban centers including Atlanta, Augusta, and Savannah, and was tied together by hundreds of miles of rural counties and narrow swamp corridors—"splitting eight counties and five municipalities along the way." *Id.* at ——, 115 S.Ct. at 2484. In 1994, five white voters from the Eleventh District, one of the African–American majority districts, filed suit against several state officials. *Id.* at ——, 115 S.Ct. at 2485. The *Miller* plaintiffs alleged that the Eleventh District was a racial gerrymander that violated the Equal Protection Clause, as interpreted in *Shaw. Id.*

A majority of the District Court panel agreed. *Johnson v. Miller*, 864 F.Supp. 1354 (S.D.Ga.1994). The lower court found that the Georgia Legislature's purpose in creating the final plan and the bizarre shape of the Eleventh District, demonstrated that race was the overriding and predominant force in the districting determination. *Id.* at 1374–78. The court therefore applied a strict scrutiny analysis, assuming that compliance with

be limited by res judicata. If they were, the Constitution would be applied differently in different locations."), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). A majority

of this panel held as much in their order denying Defendant Smith's motion to dismiss (*see* doc. 57 at 6–8).

the Voting Rights Act would be a compelling interest. *Id.* at 1381–82. Nevertheless, the court found that the Voting Rights Act did not require three African–American majority districts, and therefore that Georgia's redistricting plan was not narrowly tailored to the goal of complying with the Act. *Id.* at 1392–93.

The state defendants appealed. The Supreme Court granted a stay, *Miller v. Johnson*, 512 U.S. ——, 115 S.Ct. 36, 129 L.Ed.2d 932 (1994), and later noted probable jurisdiction, 513 U.S. ——, 115 S.Ct. 713, 130 L.Ed.2d 620 (1995).

On appeal, the state defendants argued that evidence of a legislature's deliberate classification of voters on the basis of race was insufficient to state a claim under *Shaw.* Instead, the defendants argued "regardless of the legislature's purposes, a plaintiff must demonstrate that a district's shape is so bizarre that it is unexplainable other than on the basis of race," and that the *Miller* plaintiffs had failed to make such a showing. —— U.S. at ——, 115 S.Ct. at 2485.

The Supreme Court rejected the *Miller* defendants' contention. *Id.* at —— – ——, 115 S.Ct. at 2485–87. The Court reasoned that

> [s]hape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not for other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines. The logical implication, ... is that parties may rely upon evidence other than bizarreness to establish race-based districting.

*Id.* at —— – ——, 115 S.Ct. at 2486 (collecting cases).

The Court went on to consider the required proof sufficient to sustain an equal protection challenge to a redistricting plan. The Court held that the plaintiff's burden is to show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," through either:

(1) circumstantial evidence, demonstrated by the district's shape and demographics; or (2) more direct evidence of the legislature's purpose. *Id.* at ——, 115 S.Ct. at 2488. In other words, "a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles ... to racial considerations." *Id.*

Although the district court had found it "exceedingly obvious" from the shape and demographics of the challenged District that it was deliberately drawn to encompass African–American populations, the *Miller* court did not reach the issue of whether this evidence alone was sufficient to establish a *Shaw* claim. *Id.* at —— – ——, 115 S.Ct. at 2488–89. Instead, the Court focused on the direct evidence of racial purpose considered by the district court—namely, that the Georgia Legislature was motivated by a desire to create three African–American majority districts in an attempt to get administrative preclearance from the Justice Department [28]. *See id.* at —— – ——, 115 S.Ct. at 2489–90. The Court held that the district court's finding of racial motivation was well supported, and therefore applied a strict scrutiny analysis. *Id.* at ——, 115 S.Ct. at 2490.

While the *Miller* court recognized a significant state interest in eradicating the past effects of discrimination in Georgia, it found that the Georgia Legislature was not motivated by that interest. *Id.* Instead, the Court recognized that the Legislature adopted a redistricting plan that would comply with the preclearance requirement of the Voting Rights Act, and would maximize the number of African–American majority districts. *Id.* at —— – ——, 115 S.Ct. at 2490–93. The Court held that such attempts to comply with federal antidiscrimination laws could not justify race-based districting when such districting was unnecessary "under a constitutional reading and application of those laws." *Id.* at ——, 115 S.Ct. at 2491. Indeed, the Court reasoned that "[i]t takes a shortsighted and unauthorized view of the Voting Rights Act to invoke that statute, which has played a decisive role in redressing some of our worst forms of discrimination, to demand the very racial stereotyping

---

**28.** The district court had noted that "every factor that could realistically be subordinated to racial tinkering in fact suffered that fate" in order to create the three African–American majority districts. *Johnson,* 864 F.Supp. at 1384.

the Fourteenth Amendment forbids." *Id.* at ——, 115 S.Ct. at 2494. Accordingly, the *Miller* court found that the Georgia redistricting plan failed to pass strict scrutiny, and struck down the plan as an unconstitutional racial gerrymander. *Id.*

### 2. The Parties' Contentions:

On July 6, 1995, Plaintiffs filed a supplemental motion for summary judgment, relying in large part on the authority of *Miller* and *Shaw* (doc. 64). Plaintiffs filed exhibits in support of their motion, including the Report and Recommendation of the Special Master in *DeGrandy*, as well as the expert report that the Special Master relied upon in making his recommendations (*see* doc. 87). Plaintiffs argue that the record includes both circumstantial and direct evidence that race was the predominant motivating factor in the *DeGrandy* redistricting plan. Plaintiffs further maintain that the *DeGrandy* court's creation of District Three was not narrowly tailored to further a compelling state interest.

Defendant Mortham filed a response in opposition to Plaintiffs' motion (doc. 66). Mortham argues that even assuming that race was a motivating factor in the *DeGrandy* redistricting plan, traditional redistricting factors were not sacrificed by racial considerations. Mortham cites extensively to the *DeGrandy* court and independent expert's analysis of these factors, to support her conclusion. Mortham further points out that *Miller* does not preclude race from being factored into the districting equation, citing *DeWitt v. Wilson*, 856 F.Supp. 1409 (E.D.Cal. 1994), *judgment aff'd in part and appeal dismissed in part*, 514 U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995).

Defendant–Intervenor United States also filed a response to Plaintiffs' motion (doc. 79). The United States has filed a number of exhibits in opposition of summary judgment, including the declaration of Congresswoman Brown (Defs.' Ex. A), an affidavit by Professor Richard Scher (Defs.' Ex. B), and the report by Mark Stern, the United States' expert witness in *DeGrandy* (Defs.' Ex. C). The United States first argues that Plaintiffs'

failure to submit a separate statement of undisputed material facts is grounds for denying their motion. The United States next contends that summary judgment is inappropriate because there has been no discovery. The United States also asserts that this Court should stay further proceedings pending the decisions of the Supreme Court in *Shaw v. Hunt*, —— U.S. ——, 115 S.Ct. 2639, 132 L.Ed.2d 878 (1995), and *Bush v. Vera*, —— U.S. ——, 115 S.Ct. 2639, 132 L.Ed.2d 877 (1995).

Finally, the United States maintains that Plaintiffs have failed to demonstrate the absence of triable issues of fact concerning their equal protection claims. The United States admits "it is beyond dispute that this Court considered race as an important factor in creating District 3" (doc. 79 at 18). However, the United States contends that the *DeGrandy* court also took into account traditional districting principles—thereby avoiding the impermissible racial stereotyping discussed in *Shaw*. The United States further argues that the *DeGrandy* redistricting plan was justified by the compelling government interests of complying with the Voting Rights Act and adopting a remedial measure to eradicate effects of past discrimination. The United States also asserts that there is a material question of fact as to whether District Three was narrowly tailored to further these compelling interests.

### 3. Analysis—Preliminary Issues:

As a preliminary matter, Defendant–Intervenor United States argues that Plaintiffs' failure to file a statement of undisputed material facts is grounds for denying their motion. The Local Rules specify that the failure to file such a statement "constitutes grounds for denial of the motion." N.D.Fla. Loc.R. 56.1(A). However, this case is somewhat unusual in that most of the undisputed material facts are contained in the *DeGrandy* decision itself[29]. Consequently, Plaintiffs have substantially complied with Local Rule 56.1, and denial of their motion on this ground would be inappropriate.

---

**29.** In fact, Defendant–Intervenor United States has correctly pointed out that the law of this Circuit permits the Court to take judicial notice of the findings and factual record in the *DeGrandy* litigation (*see* doc. 79 at 2 n. 2).

Defendant–Intervenor United States also argues that additional discovery is needed before the Court considers the summary judgment motions (*see* doc. 79 at 14 n. 11, 21–22; Defs.' Ex. D). A non-moving party may move pursuant to Federal Rule of Civil Procedure 56(f) for a continuance to obtain further evidence, where additional discovery would enable the non-movant to carry its burden on summary judgment [30]. *E.g., Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 n. 3 (11th Cir.1993). While the United States has not invoked Rule 56(f), it has complied with the Rule's requirements by informing the Court about the need for additional discovery to support its case [31]. *See Dean v. Barber*, 951 F.2d 1210, 1214 & n. 3 (11th Cir.1992).

To warrant granting such a motion, the United States must show "how postponement of a ruling on the motion will enable [it], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir.1990) (quoting *Wallace v. Brownell Pontiac-GMC Co., Inc.*, 703 F.2d 525, 527 (11th Cir.1983)). The issue of whether District Three is a racially gerrymandered district turns on an examination of the *DeGrandy* court's motivations in creating the Third District, as memorialized in the independent expert's report, Special Master's Report and Recommendation, and the *DeGrandy* decision itself [32]. Additional discovery would not lead to any evidence that would create a material question of fact on this issue. Therefore, on the issue of whether District Three is a racially gerrymandered district, the United States' request for additional discovery must be DENIED.

Nevertheless, the United States has also requested limited discovery on the issue of whether District Three can be upheld under a strict scrutiny analysis. Such limited discovery is appropriate. Consequently, Defendant–Intervenor United States' Rule 56(f) motion to continue is GRANTED IN PART. The parties have thirty (30) days from the date of this order within which to conduct discovery on matters relevant to a strict scrutiny analysis of District Three.

Finally, Defendant–Intervenor United States has requested the Court stay further proceedings in this matter pending the decisions of the Supreme Court in *Bush* and *Shaw*. In *Landis v. North Am. Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 165–66, 81 L.Ed. 153 (1936), the Supreme Court held that courts have the power to stay proceedings in one action pending the decision of another action. The Court reasoned that

> the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.... Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted.

*Id.* at 254–56, 57 S.Ct. at 166.

However, adequate grounds do not exist for the issuance of a stay in this matter. First, although *Bush v. Vera* and *Shaw v.*

---

**30.** Rule 56(f) provides that
[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
Fed.R.Civ.P. 56(f).

**31.** The Eleventh Circuit has recognized that "the interests of justice sometimes require postpone-

ment in ruling on a summary judgment motion, although the technical requirements of Rule 56(f) have not been met." *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 570 (11th Cir.1990).

**32.** Counsel for Defendant–Intervenor United States admitted as much during oral arguments, noting that the reasons the *DeGrandy* court adopted Plan 308 were contained in that court's orders. Counsel also agreed that it would be inappropriate under these circumstances to depose the *DeGrandy* judges, and stated that no such request would be made.

*Hunt* will undoubtedly enhance the increasing body of equal protection jurisprudence that began with *Shaw v. Reno*, the recent Supreme Court decisions in *Hays* and *Miller* have provided this Court with an adequate analytical framework to evaluate Plaintiffs' claims. Moreover, the public welfare will be better promoted by the immediate consideration of this cause, since any forthcoming Supreme Court decisions will be too untimely to effectively give this Court an opportunity to adjudicate the case at bar without potentially disrupting the 1996 congressional elections. Finally, any harm to Defendants will be *de minimis*, since it is clear in any event that the Legislature may at any time adopt its own permanent redistricting plan. Defendant–Intervenor United States' motion to stay is therefore DENIED.

### 4. Analysis—Plaintiffs' Claims Under *Shaw v. Reno:*

This is a strange and anomalous case. Over three years ago, a three-judge panel of this Court adopted a congressional redistricting plan for the State of Florida, which would purportedly be in place for the next ten years. At the time the *DeGrandy* court drew the districting lines for the State of Florida, it engaged in a good faith effort to adopt a politically neutral redistricting plan that would enhance the voting opportunities for African–American and Hispanic voters. The *DeGrandy* court closely followed the dictates of the Voting Rights Act and traditional redistricting principles throughout this process. This Court must now reexamine the redistricting lines drawn by Plan 308 and decide whether the contours of District Three are unconstitutional in light of *Shaw* and *Miller.*

Under *Shaw*, Plaintiffs' burden is to show that "race was the predominant factor motivating the [*DeGrandy* court's] decision to place a significant number of voters within or without [Florida's Third Congressional District]." *Miller*, —— U.S. at ——, 115 S.Ct. at 2488. Plaintiffs can meet their burden through either (1) circumstantial evidence, demonstrated by the district's shape and demographics; or (2) more direct evidence of the court's purpose. *Id.* at ——, 115 S.Ct. at 2488. Once Plaintiffs have met their burden,

strict scrutiny will apply and the redistricting plan defining the Third District will be unconstitutional if the *DeGrandy* court's reasons for its creation were not narrowly tailored to further a compelling state interest. *See id.* at ——, 115 S.Ct. at 2490.

Defendants have conceded that race was one of several motivating factors in drawing the Third Congressional District. However, one does not need to look any further than a map of the Third District to reach the conclusion that race was in fact the predominant motivating factor of the *DeGrandy* court. *See* Appendix A. In many respects, the Third Congressional District is a better example of racial districting than the Georgia district struck down in *Miller.* In this panel's order of August 31, 1994, the majority described District Three this way:

> The 3rd District is shaped like a gnawed wishbone, narrowly twisting about 250 miles through portions of 14 counties— some parts of it no wider than 50 yards or the length of a city block. It begins near Orlando and thinly juts out to the edge of the Atlantic Ocean in places, leaving a trail that looks like an elongated Rorschach ink blot as it zigzags all the way up to Jacksonville. Then it meanders down toward the western part of the state, following a path that resembles spilled paint, before bouncing up and trickling into Levy County, which touches the Gulf of Mexico (doc. 57 at 3, quoting *Florida–Times Union* article attached to doc. 32).

*See also DeGrandy*, 794 F.Supp. at 1090–91 (Vinson, J., specially concurring) (same). Whereas the Eleventh District in *Miller* was comprised of a large, geographically cohesive rural area joined through narrow corridors with African–American populations in Atlanta, Augusta, and Savannah, —— U.S. at ——, 115 S.Ct. at 2484, District Three is a single serpentine corridor cutting through 39 municipalities and 14 counties in the northern half of Florida. District Three includes the African–American population areas of Gainesville, Jacksonville, Daytona Beach, and Orlando. It was drawn to achieve a 54.5 percent African–American population, a 50.1 percent African–American VAP, and a 50.1 percent registered voter majority (*see De-*

*Grandy* independent expert report, Pls.' Ex. to doc. 87 at 27, 35).

This is clearly an exceptional case where the redistricting plan is "so irregular that, on its face, it rationally cannot be understood as anything other than an effort to 'segregat[e] ... voters' on the basis of race [33]." *Shaw,* 509 U.S. at ——, 113 S.Ct. at 2826 (quoting *Gomillion,* 364 U.S. at 341, 81 S.Ct. at 127). Even if it were not, the direct evidence of the *DeGrandy* panel's purpose, as evidenced by its opinion [34], the Special Master's report and recommendation, and the independent expert's report [35], would support such a conclusion [36]. The *DeGrandy* Court explained that "although respecting traditional county boundaries is a desirable approach, this aesthetic requirement should not undercut *the primary goal of creating minority districts.*" 794 F.Supp. at 1085 (emphasis added). The *DeGrandy* Court also rejected a plan submitted by T.K. Wetherell, who was then Speaker of the Florida House of Representatives, because it "elevat[ed] *the secondary criteria of compactness, coherent communities of shared interest, and respect for traditional political boundaries over the primary principle of ensuring that minority voting strength is not diluted.*" *Id.* at 1087

(emphasis added). Therefore, we conclude that there is no genuine issue of material fact regarding the issue of whether race was the predominating factor in the creation of District Three, and that Plaintiffs' motion for summary judgment on that issue must be GRANTED.

Since Plaintiffs have met their burden of showing that race was the motivating factor in drawing District Three, strict scrutiny applies. "To satisfy strict scrutiny, the state must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Miller,* —— U.S. at ——, 115 S.Ct. at 2490. Defendants have articulated two compelling interests that motivated the *DeGrandy* court in its redistricting plan. First, Defendants contend that the *DeGrandy* court was motivated by a desire to comply with sections 2 and 5 of the Voting Rights Act. Second, Defendants maintain the *DeGrandy* court desired to adopt a remedial measure designed to eradicate effects of past discrimination in Florida.

In 1975 and 1976, the Attorney General designated five Florida counties [37] as covered jurisdictions under § 4(b) of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 [38]. 40 Fed.Reg. 43746 (1975); 41 Fed.Reg. 34329 (1976). *See* 28 C.F.R. pt. 51, App. Although the preclearance require-

---

**33.** The instant case is readily distinguishable from *DeWitt v. Wilson,* 856 F.Supp. at 1409, cited by Defendants and Judge Hatchett in his dissent. Unlike the case sub judice, the redistricting plan in *DeWitt* did not create any bizarre boundaries, and the Masters "did not draw district lines based deliberately and solely on race, with arbitrary distortions of district boundaries." *Id.* at 1413.

**34.** *See DeGrandy,* 794 F.Supp. at 1085–86. In his concurring opinion, Judge Vinson stated that race was very clearly the motivating factor in the creation of District Three:

The reason for these odd shapes, of course, arises from taking several concentrations of minority population, which alone are not large enough to be the basis of a majority black or majority Hispanic district, and connecting them together in order to create such a district. The experts acknowledge that doing so, while advancing the political representation opportunities for racial and language minorities, sacrifices other important redistricting values.

*Id.* at 1091 (Vinson, J., specially concurring).

**35.** A review of the Independent Expert's discussion of the twelve proposed redistricting plans reveals that race was the driving force behind the

*DeGrandy* court's drawing of the District Three boundaries (*see* independent expert report, attach. to doc. 87, at 18–34). District Three was drawn from one of these plans, and the Expert expressly noted that "several adjustments were made to district 3 to increase the African–American VAP majority and registration levels" (*Id.* at 34–35).

**36.** "Historical background of the decision is one evidentiary source" for proof of a constitutional violation. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977); *Ammons v. Dade City, Fla.,* 783 F.2d 982, 988 (11th Cir. 1986), *reh'g denied,* 788 F.2d 1570.

**37.** Collier, Hardee, Hendry, Hillsborough, and Monroe Counties.

**38.** As a result, Florida must obtain either administrative preclearance by the Attorney General or approval by the United States District Court for the District of Columbia for "any voting qualification or prerequisite to voting, or standard practice, or procedure with respect to voting" made after November 1, 1964. 42 U.S.C. § 1973c.

ment does not apply to a redistricting plan adopted by a federal court, *see, e.g., McDaniel v. Sanchez,* 452 U.S. 130, 138, 101 S.Ct. 2224, 2230, 68 L.Ed.2d 724 (1981); *Connor v. Johnson,* 402 U.S. 690, 691, 91 S.Ct. 1760, 1761, 29 L.Ed.2d 268 (1971) (per curiam), the three-judge court in *DeGrandy* nevertheless went to great lengths to ensure that the redistricting plan it adopted was in compliance with the Voting Rights Act. *See* 794 F.Supp. at 1082–88. As the district court held in *Johnson v. Miller,* the Court may assume that compliance with federal antidiscrimination laws is a compelling state interest. *See* 864 F.Supp. at 1381–82. However, it must be noted that the Supreme Court found that the congressional plan in *Miller* "was not required by the Voting Rights Act under a correct reading of the statute." *Miller,* —— U.S. at ——, 115 S.Ct. at 2491.

Defendants also point out that the *DeGrandy* court was motivated by the compelling state interest of eradicating the effects of past discrimination in Florida. *See* 794 F.Supp. at 1079, 1085–88. Florida's past history of racial discrimination is well documented. *See, e.g., Nipper v. Smith,* 39 F.3d 1494, 1507–08 & nn. 26–28 (11th Cir.1994) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995); *DeGrandy,* 794 F.Supp. at 1079. The Supreme Court has expressly recognized a significant state interest in eradicating the effects of past racial discrimination. *E.g., Miller,* —— U.S. at ——, 115 S.Ct. at 2490; *Shaw,* 509 U.S. at ——, 113 S.Ct. at 2831. For remedial purposes, it may be necessary for the state to show that the ongoing effects of past discrimination warrant race-conscious districting. *See* James F. Blumstein, *"Racial Gerrymandering and Vote Dilution: Shaw v. Reno in Doctrinal Context,"* 26 RUTGERS L.J. 517, part IV(c) (1995).

However, in order to better assist the instant three-judge panel in determining whether District Three meets strict scrutiny, Defendant–Intervenor United States and the other party defendants have requested limited discovery on this issue. As discussed above, the Court finds limited discovery on that issue to be appropriate.

Accordingly, for all the foregoing reasons, Plaintiffs' motions for summary judgment (docs. 26 & 64) are GRANTED IN PART. Plaintiffs have shown "there is no genuine issue as to any material fact" that (1) the *DeGrandy* court lacked the constitutional authority to adopt a permanent redistricting plan, and (2) District Three is a racially motivated gerrymander. Plaintiffs are therefore entitled to partial summary judgment on those issues. *See* Fed.R.Civ.P. 56(c); *see also* Fed.R.Civ.P. 56(d) (court may enter summary judgment for party on a particular issue). Plaintiffs' motion is denied to the extent that the Court has granted the parties time for additional discovery pursuant to Rule 56(f), to determine whether District Three can survive under a strict scrutiny analysis.

## VI. Motion for Preliminary Injunction:

■ A preliminary injunction "is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion.'" *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985) (quoting *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983)), *reh'g denied,* 778 F.2d 793 (11th Cir.1985). To prevail in their motion for a preliminary injunction, Plaintiffs have the burden of proving: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) a greater injustice will result if the injunction is denied than harm caused by granting the injunction; and (4) the injunction would not disserve the public interest. *Tally–Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1022 (11th Cir.1989). Failure of Plaintiffs to demonstrate one of these elements requires this Court to deny Plaintiffs' motion for a preliminary injunction. *Cafe 207, Inc. v. St. Johns County,* 989 F.2d 1136, 1137 (11th Cir.1993).

■ Although the Court has found that the Third Congressional District was the product of racial gerrymandering, the parties have been granted leave to conduct additional limited discovery on the dispositive issue of whether the Third District fails under a strict scrutiny analysis. As a result, the Court declines to find at this time that Plaintiffs have proven a substantial likelihood of

success on the merits. The Court therefore need not reach the remaining requirements for injunctive relief. Consequently, Plaintiffs' second motion for a preliminary injunction (doc. 77) is DENIED.

Accordingly, it is therefore

**ORDERED AND ADJUDGED:**

(1) The Brown movants (doc. 52) and the Plaintiffs (doc. 73) have filed reply briefs without formally moving for leave to do so pursuant to N.D.Fla.Loc.R. 7.1(C)(2). To the extent those briefs may be considered motions for leave to file such briefs, they are GRANTED.

(2) The Cummings movants' motion to intervene (doc. 11) is GRANTED IN PART. The motion is granted to the extent that the following individuals are granted leave to intervene as defendants of right pursuant to Fed.R.Civ.P. 24(a): Bishop Frank Cummings, Mary Lawson Brown, the Reverand Samuel L. Green, Sr., Leonard O'Neal, and Glynell Presley.

(3) The congressional movants's motion to intervene (doc. 20) is GRANTED IN PART. The motion is granted to the extent that Congresswoman Corrine Brown is permitted to intervene as a defendant as of right pursuant to Fed.R.Civ.P. 24(a).

(4) Movant NAACP's motion to intervene (doc. 31) is GRANTED. The NAACP is granted leave to permissively intervene as a defendant pursuant to Fed.R.Civ.P. 24(b).

(5) Plaintiffs' Motion to Strike the Brown movants' Motion to Dismiss (doc. 75) is DENIED.

(6) Defendant–Intervenor Corrine Brown's Motion to Dismiss (doc. 68) is GRANTED IN PART. The motion is granted to the extent that the following plaintiffs residing outside the Third Congressional District are DISMISSED: Thomas S. Bloodworth, Charles Henry Bloodworth, III, Bill Boyer, Frances Brown, Robert T. Connor, Paul Farley, Hugh Milton Hays, Jr., Ron Jackson, Carolyn Janice Johnson, Susan M. Lamb, Pat Mathis, Cynthia McKinney, and Daniel McKinney.

(7) Defendant Smith's alternative motion for summary judgment (doc. 5) is DENIED.

(8) To the extent that Defendant–Intervenor United States' response to the summary judgment motions (doc. 79) may be construed as a motion for a continuance pursuant to Rule 56(f), that motion is GRANTED IN PART. The parties have thirty (30) days from the date of this order within which to conduct discovery on matters relevant to a strict scrutiny analysis of District Three.

(9) To the extent that Defendant–Intervenor United States' response to the summary judgment motions (doc. 79) may be construed as a motion for a stay of these proceedings, that motion is DENIED.

(10) Plaintiffs' Motion (doc. 26) and Supplemental Motion for summary judgment (doc. 64) are GRANTED IN PART. The Court finds that the *DeGrandy* court lacked the constitutional authority to adopt a permanent congressional redistricting plan. The Court further finds that Florida's Third Congressional District constitutes a racial gerrymander. The Court denies summary judgment on the issue of whether the Third Congressional District passes a strict scrutiny analysis.

(11) Plaintiffs' Second Motion for a Preliminary Injunction (doc. 77) is DENIED.

(12) Deadlines for filing all dispositive pretrial motions, responsive memoranda and a pretrial stipulation, and dates for a pretrial conference and trial in this matter, will be set by separate order.

DONE AND ORDERED.

VINSON, J., concurs.

APPENDIX A

## *Florida's Third Congressional District*

IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

Andrew E. JOHNSON, Thomas S. Bloodworth, Charles Henry Bloodworth, III, Bill Boyer, Frances Brown, Robert T. Conner, Harold F. Davis, Arthur Wilson Devoe, Robert Ellison, George Erdel, Paul Farley, Sue Hall, Hugh Milton Hays, Jr., Hugh Milton Hayes, Sr., Carson Thomas Howes, Jr., Ron Jackson, Carolyn Jancie Johnson, Coranell H. Johnson, Susan M. Lamb, Jim Lewis, Pat Mathis, Cynthia McKinney, Jim Neill, Tommy Praeter, Charles Romero, Vicki T. Tomero, and Dana White,

Plaintiffs,

v.

Jim SMITH, in His Official Capacity as Secretary of State of the State of Florida, Pat Thomas, in His Official Capacity as President of the Florida Senate; and Bolley Johnson, in His Official Capacity as Speaker of the Florida House of Representatives,

Defendants.

CASE NO. 94-40025-WS

Before HATCHETT, Circuit Judge, and STAFFORD and VINSON, District Judges.

ORDER

Currently pending is the motion of defendant Jim Smith, as Secretary of State of the State of Florida, to dismiss the complaint for failure to state a claim upon which relief can be granted. (Doc. 5).

I. BACKGROUND

After the 1990 decennial census, the state of Florida became entitled to four additional representatives in the United States House of Representatives. The Florida legislature is required to reapportion and redistrict Florida's legislative and congressional districts after each decennial census. In 1992, although the Florida legislature ultimately adopted a legislative apportionment plan, it failed to adopt any congressional redistricting plan.

At the time the Florida legislature adjourned in 1992 without adopting a congressional redistricting plan, a challenge to the Florida legislative and congressional apportionment was already pending before this court. On May 29, 1992, this court adopted a congressional redistricting plan on the report and recommendation of special master C. Clyde Atkins, Senior United States District Judge, Southern District of Florida. Judge Atkins recommended that the court adopt the plan—Plan 308—assembled by a court-appointed independent expert, rather than any of the plans submitted by the various parties. Designating Plan 308 as the 1992 Florida Redistricting Plan, this court ordered the State of Florida to conduct congressional elections in 1992, and thereafter, in accordance with that plan. *DeGrandy v. Wetherell,* 794 F.Supp. 1076 (N.D.Fla.1992).

The 1992 Florida Redistricting Plan created two congressional districts in which a majority of the voting age population was black (District Seventeen, located within Dade County, and District Three located in north and central Florida), and created two congressional districts in which a majority of the voting age population was Hispanic (Districts Eighteen and Twenty-One, both in Dade County). The plan also created a "minority influence district" in southeast Florida with a black voting age population of 45.7% (District Twenty-Three in South Florida). The 1992 plan adopted by this court created some odd-shaped districts, notably District Three which has been described this way:

The 3rd District is shaped like a gnawed wishbone, narrowly twisting about 250 miles through portions of 14 counties—some parts of it no wider than 50 yards or the length of a city block.

It begins near Orlando and thinly juts out to the edge of the Atlantic Ocean in places, leaving a trail that looks like an elongated Rorschach ink blot as it zigzags all the way up to Jacksonville. Then it meanders down toward the western part of the state, following a path that resembles

spilled paint, before bouncing up and trickling into Levy County, which touches the Gulf of Mexico.

*The Florida Times–Union* (Jan. 21, 1994, p. A–12). It is District Three which is being challenged by the plaintiffs in this case as a racial gerrymander.

After the 1992 Florida Redistricting Plan was adopted by this Court, the Supreme Court of the United States decided *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), involving a challenge to two majority-black congressional districts created after the 1990 census by the North Carolina legislature, both of which were irregularly-shaped.

In *Shaw v. Reno,* the Supreme Court held that by alleging that a redistricting plan is "so irrational on its face that it can be understood only as an attempt to segregate voters into separate voting districts because of their race ... [without] sufficient justification" the plaintiffs had stated a cause of action under the Equal Protection Clause of the Fourteenth Amendment. 509 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 536. The Court emphasized that classifying individuals on the basis of race is odious and that "even for remedial purposes, [it] may balkanize us into competing racial factions." 509 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 535. Racial gerrymandering, the Court said, "threatens to carry us further from the goal of a political system in which race no longer matters." 509 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 535. Because the plaintiffs adequately alleged a case of racial gerrymandering, the Court ordered that, on remand, if the allegation of racial gerrymandering remained uncontradicted, the State of North Carolina would have to demonstrate that its plan was "narrowly tailored to further a compelling governmental interest." 509 U.S. at ——, 113 S.Ct. at 2832, 125 L.Ed.2d at 536.

Both the majority and the dissent in *Shaw v. Reno* agreed that *United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) ("*UJO* "), prohibited white voters from mounting vote dilution challenges to majority-minority districts if they have proportional representation on a statewide basis. Thus, there is no cause of action for vote dilution under either the Voting Rights Act or the Constitution based on the mere fact that a voting district was created with a majority of racial minority voters. However, in *Shaw v. Reno,* the Supreme Court clarified that "sound districting principles" must be employed in all redistricting decisions, including those attempting to comply with the Voting Rights Act. It recognized that the *UJO* decision was not meant to preclude voters of any race from raising the "analytically distinct claim that a reapportionment plan rationally cannot be understood as anything other than an effort to segregate citizens into separate voting districts on the basis of race without sufficient justification." *Shaw v. Reno,* 509 U.S. at ——, 113 S.Ct. at 2830, 125 L.Ed.2d at 532.

Plaintiffs in this case allege neither that District Three violates the Voting Rights Act, nor that it represents an unconstitutional dilution of white voting strength. Instead, the plaintiffs allege that District Three, as established by this court's 1992 order, unconstitutionally segregates voters on the basis of race in violation of the Equal Protection Clause. Simply put, plaintiffs' claim in this case is the same as that recognized in *Shaw v. Reno.*

## II. ANALYSIS

### A. *Motion To Dismiss.*

A motion to dismiss for failure to state a claim cannot be granted unless the complaint alleges no set of facts, which, if proved, would entitle the plaintiff to relief. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974); *Duke v. Cleland,* 5 F.3d 1399, 1402 (11th Cir.1993). On a motion to dismiss, the court must accept all the alleged facts as true and find all inferences from those facts in the light most favorable to the plaintiff. *See, e.g., Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Jones v. Resolution Trust Corp.,* 7 F.3d 1006, 1009 (11th Cir. 1993).

B. *Collateral Estoppel.*

Defendant Smith asserts in his motion to dismiss that the plaintiffs are collaterally estopped from bringing this suit because they could have intervened in, and prosecuted their claims in, the earlier case of *DeGrandy v. Wetherell.* Smith notes that, while plaintiffs here did *not* seek to intervene in the earlier action, leave to intervene in the *De-Grandy* litigation was freely given to those who asked for it.

In the Eleventh Circuit, the prerequisites of the doctrine of collateral estoppel have been described as follows:

Collateral estoppel is issue preclusion; it refers to the preclusive effect of a judgment in foreclosing the relitigation of a particular issue in a subsequent proceeding, if that issue was raised, litigated, and adjudicated in a prior lawsuit, and if the adjudication of the issue was necessary to the outcome of the prior lawsuit.

Like the doctrine of *res judicata,* the doctrine of collateral estoppel also has certain prerequisites to its application: (1) the issue at stake must be identical to the one involved in the prior litigation, (2) the issue must have been actually litigated in the prior suit, (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action, and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. While *res judicata* forecloses all claims which might have been litigated in the prior lawsuit, collateral estoppel assigns a preclusive effect only to those issues actually and necessarily decided in the prior lawsuit.

*S.E.L. Maduro v. M/V Antonio De Gastaneta,* 833 F.2d 1477, 1483 (11th Cir.1987) (citations omitted).

It does not appear that these four prerequisites to the application of the doctrine of collateral estoppel are satisfied here. The

issue in this case is whether District Three is an unconstitutional racial gerrymander under the rationale of *Shaw v. Reno.* That issue was not actually raised, litigated, or adjudicated in *DeGrandy,* and therefore, it could not have been a critical and necessary part of the judgment in that action. But even if we assume (for purposes of this motion) that the inherent tension between the Voting Rights Act and the established standards of partisan gerrymandering[1] was then justiciable, and that racial gerrymandering was implicit in the *DeGrandy* action, the plaintiffs here did not have a full and fair opportunity to litigate it. District Three was created, of course, as part of the plan adopted as the remedy in the *DeGrandy* litigation. Defendant Smith seems to suggest that the plaintiffs should have anticipated that District Three would be created in this manner, and that they must have intervened then in order to challenge its constitutionality—before it was even conceived. Further, the claim which the plaintiffs are asserting now under *Shaw v. Reno* had not been recognized at the time of the *DeGrandy* litigation as an analytically distinct claim. Thus, the issue at stake here is not identical to one involved in *DeGrandy;* it was not actually litigated in *DeGrandy;* it was not a critical and necessary part of the *DeGrandy* judgment; and the plaintiffs here did not have a full and fair opportunity to litigate the issue in *DeGrandy.*

We conclude that the plaintiffs are not collaterally estopped from now challenging District Three as an unconstitutional racial gerrymander under *Shaw v. Reno.*

C. *Judicially Drawn Redistricting Plans.*

Defendant Smith attempts to distinguish this case from *Shaw v. Reno* because the congressional district challenged in *Shaw* was part of a legislatively drawn redistricting plan, whereas the congressional district challenged in this lawsuit is part of a judicially drawn redistricting plan. Judge Hatchett, in dissent, adds that, because the State of Florida "bears no responsibility for the development and implementation of the 1992 redis-

---

**1.** *See,* Bryant, Giddings & Kaplan, *Partisan Gerrymandering: A New Concern for Florida's 1992* *Reapportionment,* 19 Fla.St.U.L.Rev. 265 (1991).

tricting plan," the plaintiffs have not pleaded sufficient state action to support this court's jurisdiction under the Fourteenth Amendment.

Defendant Smith relies on *Swann v. Charlotte–Mecklenburg Board of Education* [402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) ] and its progeny for the proposition that federal judges have broad remedial powers to remedy state-imposed unconstitutional racial discrimination. *Swann* was a school desegregation case, and the court approved the "pairing and grouping of noncontiguous school zones" as a part of the school district's desegregation efforts. *Swann* is not really on point in this case, for election districts and voting rights were clearly not involved. Moreover, *Swann* certainly did not hold that federal judges have the power to impose **unconstitutional** remedies. Neither courts nor states are exempt from the requirements of the constitution. At the hearing on the motion to dismiss, the defendants and proposed intervenors stressed that this court held in *DeGrandy* that the then-existing Florida congressional districts were unconstitutional, so that the new plan was within the court's remedial powers. While true, it is irrelevant to the constitutionality of the 1992 plan. A court is not free to impose an unconstitutional redistricting plan merely because the one it is replacing was also unconstitutional. If District Three is racially gerrymandered in violation of the Fourteenth Amendment, then it is subject to being challenged as unconstitutional, regardless of which branch of government authored the plan which set it up, or whether the plan it replaced was also unconstitutional. Nor is there a question of retroactivity involved, because the plaintiffs' claimed violation is current and ongoing.

### D. *Nature of the Claim.*

Defendant Smith's strongest argument for dismissal is the assertion that the complaint should be dismissed because the plaintiffs invoke Title 42, United States Code, Section 1985 as a basis for jurisdiction. The elements of a cause of action under Section 1985 are:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 627 (11th Cir.1992) (quoting *United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983)). Because the plaintiffs have failed to plead a conspiracy, defendant Smith's motion to dismiss will be granted to the extent he seeks dismissal of any claim under Section 1985.

However, plaintiffs also invoke jurisdiction under Title 28, United States Code, Section 1343, which provides the federal district courts with original jurisdiction over actions to "redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States." 28 U.S.C. § 1343(a)(3). This is sufficient.

We also find no merit in the contention that there is no state action involved. It is undisputed that the state, and the state alone, actually conducts the elections. Plaintiffs allege that defendant Smith, as Secretary of State, is charged with administering elections to the United States Congress in the State of Florida. They allege that defendants Pat Thomas and Bolley L. Johnson, as President of the Florida Senate and Speaker of the Florida House of Representatives, respectively, are charged with responsibility for redistricting congressional districts. These defendants, on behalf of the State of Florida, would have to provide relief if any relief is merited.

In sum, plaintiffs have alleged that the State of Florida's currently existing congressional District Three violates their right to equal protection under the Fourteenth Amendment. They are not estopped from doing so. They have stated a claim that is

cognizable under Supreme Court precedent and over which this court has jurisdiction under Section 1343(a)(3).

Accordingly, it is ORDERED:

Defendant Smith's motion to dismiss for failure to state a claim is DENIED.

DONE AND ORDERED this 31st day of August, 1994.

/s/ Roger Vinson
ROGER VINSON
United States District Judge

Judge STAFFORD concurs in denying the motion to dismiss.

HATCHETT, [Circuit] J[udge], dissenting.

The majority correctly concludes that 42 U.S.C. § 1985 does not provide this court jurisdiction, but incorrectly concludes that the complaint sufficiently alleges an equal protection claim, affording this court jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The majority also grounds this court's jurisdiction in the Fourteenth Amendment and *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).*

I disagree with the majority's conclusion that the plaintiffs have pled sufficient "state action" to support this court's jurisdiction or to state a claim upon which relief can be granted. The Fourteenth Amendment mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2. Accordingly, in *Shaw v. Reno,* the Supreme Court recognized a Fourteenth Amendment challenge to a legislatively drawn redistricting plan.

In this case, the state of Florida bears no responsibility for the development and implementation of the 1992 redistricting plan; rather, this court developed the 1992 plan and its oddly-shaped third congressional district to replace the state's prior unconstitutional congressional districts. In *Swann v.*

*Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 27, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971), the Supreme Court endorsed a district court's "frank—and sometimes drastic—gerrymandering of school districts and attendance zones," which resulted in "zones [that] are neither compact nor contiguous.... *As an interim corrective measure,* this cannot be said to be beyond the broad remedial powers of a court." 402 U.S. at 27, 91 S.Ct. at 1282 (emphasis added). Thus, the Supreme Court has held that federal courts have wide latitude in fashioning remedies in response to state imposed constitutional violations. Consequently, the majority errs in concluding that this court has jurisdiction, and that the plaintiffs have stated a claim upon which relief can be granted.

Moreover, the plaintiffs are collaterally estopped from bringing this lawsuit. The presence of the following four factors invokes the preclusive effect of collateral estoppel:

(1) The issue at stake must be identical to the one involved in the prior litigation, (2) the issue must have been actually litigated in the prior suit, (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment of that action, and (4) the party against whom the earlier decision was asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.

*S.E.L. Maduro v. M/V Antonio De Gastaneta,* 833 F.2d 1477 (11th Cir.1987); *I.A. Durbin, Inc. v. Jefferson National Bank,* 793 F.2d 1541, 1549 (11th Cir.1986); *see also In Re: St. Laurent,* 991 F.2d 672, 675–76 (11th Cir.1993).

This case satisfies all four prerequisites for collateral estoppel. First, this case presents one of the same issues involved in the *De-Grandy* litigation: the constitutionality of Florida's congressional districts. *See De-Grandy v. Wetherell,* 794 F.Supp. 1076 (N.D.Fla.1992). Second, the constitutionality of the third congressional district was a critical and necessary part of the judgment in

---

* It is interesting that the majority relies heavily on *Shaw v. Reno,* and assumes that it dictates the result in this case without citing any authority holding that the case is to be applied retroactively. Additionally, the *DeGrandy* case was pending before the Supreme Court at the time the Supreme Court announced its decision in *Shaw v. Reno.* Surely, the Supreme Court would have remanded *DeGrandy* to this court with directions if it had considered *Shaw v. Reno* relevant.

*DeGrandy.* Issues regarding the shape, compactness, length, and reach of the third congressional district were fully litigated. Third, the *DeGrandy* action presented the plaintiffs with a full and fair opportunity to litigate the issues through intervention. This court, in the *DeGrandy* litigation, permitted several parties interested in the outcome of the litigation to intervene or otherwise participate.** The plaintiffs abstained from pursuing their claim in the *DeGrandy* litigation.

The parties in this case are requesting that this court reconsider its ruling regarding district 3 in *DeGrandy.* Even the parties in *DeGrandy* are now foreclosed from seeking a *Shaw v. Reno* ruling through a motion for new trial in *DeGrandy.* The parties in *De-Grandy* did not take an appeal; consequently, the *DeGrandy's* parties' rights are settled. Yet, according to the majority, the parties in this case, although not parties in *DeGrandy,* have a greater right to attack the third congressional district than the parties in *De-Grandy.* This lawsuit constitutes nothing more than parties who were not in the original *DeGrandy* case seeking a new trial in that case. If the majority is right, anyone in the state of Florida may ask this court to reconsider any of its prior rulings in the *DeGrandy* case. The majority would accept such a lawsuit simply because the Supreme Court has ruled in another case subsequent to *DeGrandy* on a voting rights issue. Following the majority's reasoning to its logical conclusion would ensure that no ruling would ever be final—not even rulings that the parties failed to appeal.

For the foregoing reasons, I respectfully dissent from the majority's opinion. I would dismiss this case.

HATCHETT, Circuit Judge, Dissenting:

Because the majority has erred in: (1) finding that plaintiff Andrew Johnson has standing in this lawsuit; (2) denying Corrine Brown's motion to dismiss; (3) holding that the *DeGrandy* court's injunction violates the Constitution; and (4) granting plaintiffs summary judgment on their claim that the Third District constitutes a racial gerrymander, I dissent.

Preliminarily, it is important to emphasize that today the majority has not held that the Third District is unconstitutional. Rather, the majority has found that the Third District, due to its appearance, cannot rationally be understood as anything other than an effort to segregate voters on account of race. In the alternative, the majority has held, solely on the basis of the *DeGrandy* opinion and without permitting the parties to engage in discovery, that race was the predominant factor motivating the three-judge federal court in drawing the Third District. Accordingly, this lawsuit will continue, and this court will have to determine whether the Third District is narrowly tailored to achieve a compelling interest. If it is, the Third District will pass constitutional muster.

### 1. Standing

Plaintiff Andrew Johnson does not reside in the Third District, and he has presented no specific evidence showing that he has personally been subjected to a racial classification. Thus, he lacks standing to bring this lawsuit. *United States v. Hays,* —— U.S. ——, ——, 115 S.Ct. 2431, 2436, 132 L.Ed.2d 635 (1995). I fail to see how the majority's reference to the Qualifications Clause has any relevance to this inquiry.

### 2. Motion to dismiss

I would grant Corrine Brown's motion to dismiss this action for the reasons stated in

** In addition to the *DeGrandy* plaintiffs, the court also granted intervention and *amicus curiae* status to the following groups and individuals.

Those acting as amici are: Simon Ferrell, State Chairman of the Florida Democratic Party; Common Cause; Florida AFL/CIO; United States Representative Craig James; the Cuban American Bar Association; the Coalition of Hispanic Women; and State Representative Daniel Webster. Plaintiff Intervenors include: Gwen Humphrey, State Representative Darrell Reaves; United States Representative Jim Baccus; and United States Representative Andy Ireland. State Representative Also Reddick is a defendant/intervenor.
*DeGrandy,* 794 F.Supp. at 1080.

my dissenting opinion to this court's unpublished order of August 31, 1994. *See* Appendix B to the majority's opinion.

### 3. Constitutionality of the *DeGrandy* injunction

In deciding that the *DeGrandy* court's injunction violates the Constitution, the majority has improperly gone out of its way to decide an issue that has not been presented to this court. The majority asserts that "[p]laintiffs have challenged the *DeGrandy* court's imposition of a permanent state redistricting plan[20], and this panel may properly consider such a challenge." In footnote twenty, the majority states:

> While Plaintiffs did not expressly challenge the permanence of the *DeGrandy* plan in their complaint (*see* doc. 2), they have raised such a challenge in their motions for summary judgment (doc. 26 at 8; doc. 64 at 5), which should be treated as a motion to amend their complaint. This Court has substantial discretion in allowing the parties to amend their pleadings, and leave to amend is to "be freely given when justice so requires." Fed.R.Civ.P. 15(a).

A reading of the complaint not only confirms the majority's contention that the plaintiffs "did not expressly challenge the permanence of the *DeGrandy* plan," but also reveals that the plaintiffs did not even *implicitly* raise this issue.[1] Moreover, the majority's citations to the plaintiffs' motions for summary judgment simply do not support its contention that the plaintiffs have challenged the *DeGrandy* injunction. Page five of the plaintiffs' supplemental motion for summary judgment (doc. 64) states in part:

> At the July 1, 1994 hearing on the parties' Motion for Summary Judgment, the Court was advised that the Florida Legislature desired the opportunity to redistrict the State should it be determined that any or all of Florida's Congressional Districts were unconstitutional racial gerrymanders. In response to the ruling of the Supreme Court in *Miller v. Johnson,* Peter Wallace, the speaker of the Florida House of Representatives[,] called a press conference at which he indicated a willingness to move quickly on legislative redistricting and at which he suggested the necessity of calling a special session of the Florida Legislature in the fall of 1995 to consider legislative redistricting. There is little doubt that this Court does not want to the [sic] burdened with the process of legislatively redistricting the State of Florida on a second occasion during this decade. Consequently, rapid action on the movants' motion would most likely lead to legislative redistricting being resolved in the legislative forum rather than a judicial forum.

(doc. 64 at 5).[2] This language does not even remotely indicate that the plaintiffs "have challenged the *DeGrandy* court's imposition of a permanent state redistricting plan."

The majority's citation to the plaintiffs' motion for summary judgment (doc. 26) also fails to support its contention. Page eight of that motion reads, in relevant part:

> The Florida Legislature in this case was prevented from enacting a replacement plan by paragraph 2 of the [*DeGrandy*] court's judgment which stated that plan 308 would not be merely a temporary plan but instead would be "the plan to be utilized in the 1992 Florida congressional elections and in Florida congressional elections thereafter." To this extent, the court appears to have deviated from the limited authority to create court-drawn redistricting plans set out by the Supreme Court. It has also violated the principle of the separation of powers and has prevented the Florida Legislature from fulfilling its obligations under Article III, Section 3 of the Florida Constitution to redistrict the State after the decennial census. *Any alternative adopted by the court should cure that initial defect in the Judgment by making any court-ordered redistricting plan a temporary measure pending legislative action.*

---

1. A copy of the plaintiffs' complaint is set forth as Appendix A to this opinion.

2. A copy of page five of plaintiffs' supplemental motion for summary judgment is provided as Appendix B to this opinion.

(doc. 26 at 8) (emphasis added).[3] As the emphasized language shows, in this motion the plaintiffs only request that if this court issues a redistricting plan as part of its relief, that plan should be temporary in nature. Though the rest of the plaintiffs' language certainly opines that the *DeGrandy* court exceeded its authority in rendering its injunction, I do not see how the majority can fairly transform that language into a *challenge* to that injunction.

Even assuming that one could read the plaintiffs' pleadings as somehow asserting this challenge, events at this court's October 19, 1995 hearing render the majority's position wholly unsustainable. Amazingly, the majority's creation of the plaintiffs' challenge to the *DeGrandy* injunction persists despite the plaintiffs' express admission that they are not pursuing such a challenge. At the October hearing, at which time the parties orally argued the plaintiffs' motions for summary judgment, the following exchange transpired between this court and plaintiffs' counsel:

JUDGE HATCHETT: Let me make sure I understand your position. As I understand it at this point, you're urging that this Court simply read the *DeGrandy* opinion and hold that District 3 is unconstitutional based upon *Shaw* and cases that have come down since this Court ruled in *DeGrandy*.

MR. SULLIVAN: That's correct.

JUDGE HATCHETT: That's your position?

MR. SULLIVAN: Yes. There was a suggestion made by the Department of Justice that this Court simply modify its prior order and order that Plan 308 would only be the congressional districting plan until the legislature came forward with another plan.

That particular suggestion sidesteps the basic issue here, which is, has this district been constitutionally racial gerrymandered, and are my clients, in fact, aggrieved parties as a result of that racial gerrymandering?

If the court wants to take that particular course of action, first of all, it would be almost an invitation to grid lock the legislature, since there are parties who both support and oppose the currently existing plan.

Secondly, it would ignore the fact that the plan, as it currently exists, is unconstitutional and would give solace to people who would believe that it can continue to hold elections according to an unconstitutional redistricting plan, and overlook the violations of the rights of the plaintiffs in this particular case.

JUDGE HATCHETT: I want to make sure I understand you on that, too. You are not urging this Court to amend its injunction in the *DeGrandy* case?

MR. SULLIVAN: That's correct.

JUDGE HATCHETT: All right.

(doc. 90 at 116–17). The majority's holding that the plaintiffs have raised a challenge to the *DeGrandy* injunction, in light of plaintiffs' express admission to the contrary, is simply incomprehensible.

Furthermore, assuming (now hypothetically) that the plaintiffs somehow presented this challenge, the majority fails to provide legal support for its conclusion in footnote twenty that the plaintiffs' alleged challenge "should be treated as a motion to amend their complaint." In support of this conclusion, the majority states that this court "has substantial discretion in allowing parties to amend their pleadings, and leave to amend is to be 'freely given when justice so requires.' Fed. R.Civ.P. 15(a)." This is a correct statement of the law, but one that has no relevance here *because the plaintiffs have not moved to amend their pleadings to include this challenge.*[4] Rule 15(a) of the Federal Rules of Civil Procedure addresses a *party* amending its pleadings; the rule does not speak to a court amending a party's pleadings *sua sponte*. *See* Fed.R.Civ.P. 15(a). Additionally, because the plaintiffs never made this

---

**3.** A copy of page eight of plaintiffs' motion for summary judgment is put forth as Appendix C to this opinion.

**4.** Of course, one would not expect the plaintiffs to amend their pleadings to include a challenge that they have admitted they are not pursuing.

challenge, the defendants and intervenors never had an opportunity to respond to it.[5] Therefore, the majority's granting of summary judgment on this "issue" is fundamentally unfair.

In sum, the majority possesses no support for its contention that the plaintiffs have challenged the *DeGrandy* injunction.[6] Unfortunately, what seems clear is that the majority so wants to expound on the propriety of the injunction that it is willing to overlook the parties' failure to raise the issue. I cannot condone the majority's action.

I also disagree with the majority's contention that this panel could consider such a challenge. The *DeGrandy* action ended when none of the parties to that lawsuit appealed that court's May 29, 1992 judgment. On March 14, 1994, the Chief Judge of the Eleventh Circuit designated this panel to preside over this case. The issue of the

propriety of the *DeGrandy* injunction should be addressed when a party to the *DeGrandy* litigation raises that issue to the *DeGrandy* court.[7]

As to the resolution of the plaintiffs' "challenge" to the injunction, I note only that the majority cites *no* precedent to support its holding that the *DeGrandy* court's injunction violates constitutional separation of powers and federalism principles.

### 4. Summary judgment on the racial gerrymander claim

In granting summary judgment for the plaintiffs on their racial gerrymander claim, the majority holds that *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), control this case.[8] It is evident, however, that

---

5. Indeed, if, as the majority asserts, the plaintiffs have raised this challenge, one wonders why none of the defendants or intervenors has responded to it in their pleadings.

6. The majority's response to my dissent in footnote twenty of its opinion does not affect this conclusion. There the majority writes that the plaintiffs have "consistently attacked" the constitutionality of the *DeGrandy* injunction. In support of this assertion, however, the majority only provides language (selectively edited at that) from one pleading—the plaintiffs' motion for *summary judgment.* As discussed above, that language, when read in context, cannot fairly be characterized as constituting a challenge to the injunction. The majority does not, because it cannot, cite language from the plaintiffs' complaint or supplemental motion for summary judgment in support of its position. The only other evidence the majority provides to demonstrate the existence of the plaintiffs' challenge is a selectively edited excerpt of plaintiffs' counsel's statements made at the October hearing. The majority's reference to this language proves the desperate state of its position. Plaintiffs' counsel made those comments in responding to the Justice Department and State of Florida's contention that the *DeGrandy* redistricting plan constituted a remedial plan pursuant to *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); even the most creative reading of those comments does not reveal that counsel was articulating a constitutional challenge to the *DeGrandy* injunction. (A copy of plaintiffs' counsel's discussion of the *Milliken* issue (doc. 90 at 46–51) is provided as Appendix D to this opinion.) Finally, the majority writes that though plaintiffs' counsel expressly admitted that he was not asking this court to amend the *DeGrandy*

injunction, "[p]laintiffs were not abandoning their attack" on the injunction. In other words, the majority is reduced to contending that plaintiffs' counsel did not mean what he said at the October hearing.

7. The *DeGrandy* court has continuing power to supervise and modify its injunction. *See Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 407 (5th Cir.1971) ("It is well settled that the issuing court has continuing power to supervise and modify its injunctions in accordance with changed conditions."); *see also United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (power to modify an injunction "directed to events to come is subject always to adaptation as events may shape the need"). Moreover, the parties to the *DeGrandy* action can move that court to modify the injunction. *See* Fed.R.Civ.P. 60(b); *United States v. Georgia Power Co.,* 634 F.2d 929, 933 (5th Cir. Unit B Jan. 1981) (the issuing court can prospectively modify a permanent injunction pursuant to rule 60(b)(5) when the "court is convinced 'it is no longer equitable that the judgment should have prospective application'") (quoting Fed.R.Civ.P. 60(b)(5)), *vacated and remanded on other grounds,* 456 U.S. 952, 102 S.Ct. 2026, 72 L.Ed.2d 477 (1982). None of the parties to the *DeGrandy* action, however, have sought to modify the injunction.

Clearly, the majority is usurping the Chief Judge's power to assign judges to specific cases.

8. Of course, this is the same majority that states, in footnote twenty-six of its opinion, that it "is unwilling to reach ... [the] conclusion" that "the Fourteenth Amendment does not apply to federal courts."

the principles expressed in *Shaw* and *Miller* are confined to the context of a Fourteenth Amendment challenge to a *state legislature's* redistricting scheme. The introductory sentence of Justice O'Connor's opinion in *Shaw* states: "This case involves two of the most complex and sensitive issues this Court has faced in recent years: the meaning of the constitutional 'right' to vote, and *the propriety of race-based state legislation* designed to benefit members of historically disadvantaged racial minority groups." *Shaw*, 509 U.S. at ——, 113 S.Ct. at 2819 (emphasis added). Moreover, the *Shaw* Court framed its holding as follows:

> [W]e conclude that a plaintiff challenging a *reapportionment statute* under the Equal Protection Clause may state a claim by alleging that *the legislation*, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification.

*Shaw*, 509 U.S. at ——, 113 S.Ct. at 2828 (emphasis added).

Justice Kennedy's opinion in *Miller* also unequivocally restrains the principles expressed in that case to the context of a challenge to a state legislature's redistricting plan:

> The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a *legislature's redistricting calculus*. *Redistricting legislatures* will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process. The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded *legislative enactments*, requires courts to exercise extraordinary caution in adjudicating claims *that a state has drawn district lines on the basis of race*. The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to *legislative pur-*

*pose*, that race was the predominant factor *motivating the legislature's decision* to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that *the legislature subordinated traditional race-neutral districting principles*, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for *redistricting legislation*, and are not subordinated to race, a state can "defeat a claim that a district has been gerrymandered on racial lines."

*Miller*, —— U.S. at ——, 115 S.Ct. at 2488 (citations omitted) (emphasis added) (quoting *Shaw*, 509 U.S. at ——, 113 S.Ct. at 2827).

This case, in contrast, involves a challenge to a congressional district a *three-judge federal court* drew in fashioning a *remedial* state-wide congressional redistricting plan in response to the Florida Legislature's failure to do so. Accordingly, the prescriptions of *Shaw* and *Miller* do not apply here.

The Supreme Court's treatment of *DeWitt v. Wilson*, 856 F.Supp. 1409 (E.D.Cal.1994), *aff'd in part and appeal dismissed in part*, —— U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995), bolsters this conclusion. In fact, *DeWitt* constitutes a more analogous (and thus more persuasive) precedent for this case than does *Shaw* or *Miller*. In *DeWitt*, a three-judge federal court upheld the constitutionality of the 1992 redistricting plan the California Supreme Court enacted in the face of legislative impasse. The *DeWitt* court noted that the district lines were not "based deliberately and solely on race, with arbitrary distortions of district boundaries." 856 F.Supp. at 1413. Rather, the redistricting plan "looked at race . . . as one of the many factors to be considered," which included population equality, compliance with the Voting Rights Act, and respect for communities of interest, compactness, geographic integrity, contiguity, and political boundaries. 856 F.Supp. at 1413. The Supreme Court summarily affirmed *DeWitt* the same day it issued its opinion in *Miller*. *DeWitt v. Wilson*, —— U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d

876 (1995). Because a review of the *DeGrandy* opinion shows that the three-judge court "did not redistrict based solely on race, but ... consider[ed] race as a component of traditional redistricting principles," I would deny the plaintiffs' motions for summary judgment on the authority of *DeWitt*. 856 F.Supp. at 1415.

Assuming, however, that *Shaw* and *Miller* do apply to this case, those decisions do not compel granting summary judgment for the plaintiffs on their racial gerrymander claim at this stage of the litigation. *Miller* construed and modified *Shaw* as follows:

> Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.

*Miller*, ⎯⎯ U.S. at ⎯⎯, 115 S.Ct. at 2486. The Court went on to state that "[i]n the absence of a pattern as stark as those in *Yick Wo* [*v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886),] or *Gomillion* [*v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)], '... the Court must look to other evidence' of race-based decisionmaking." *Miller*, ⎯⎯ U.S. at ⎯⎯, 115 S.Ct. at 2487 (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)).

In granting summary judgment to the plaintiffs pursuant to *Shaw*, the majority provides one paragraph of analysis. The majority first states that "one does not need to look any further than a map of the Third District to reach the conclusion that race was in fact the predominant motivating factor of the *DeGrandy* court." I find this conclusory, "it is because it is" reasoning wholly unpersuasive. I, for one, need to look further than a map to reach such a conclusion; apparently, so do the legal representatives of the United States and Florida governments. The majority must recognize the weakness in its first statement, however, because it next provides a quotation from a newspaper editorial (entitled "Odd Shape a Travesty") describing the inelegant appearance of the Third District. I am sure the majority comprehends the persuasive effect that newspaper editorials have in the Eleventh Circuit. Next, the majority refers to Judge Vinson's concurring opinion in *DeGrandy*, where he wrote that the Third District "has the appearance of something lifted from a Rorschach test." *DeGrandy v. Wetherell*, 794 F.Supp. 1076, 1090 (N.D.Fla. 1992) (Vinson, J., specially concurring). Judge Vinson, of course, joined the *DeGrandy* court's opinion and explained in his special concurrence that the redistricting plan "is fair and accomplishes what we are striving to do." 794 F.Supp. at 1084. Finally, the majority asserts that the Third District's shape is more bizarre than the shape of the district at issue in *Miller*, Georgia's Eleventh District. This comparison has absolutely no relevance because the Supreme Court did not find, pursuant to *Shaw*, that Georgia's Eleventh District constituted, on its face, a racial gerrymander. Rather, the Court considered "additional evidence showing that the General Assembly was motivated by a predominant, overriding desire to assign black populations to the Eleventh District" in order to create a third African–American majority congressional district in Georgia. *Miller*, ⎯⎯ U.S. at ⎯⎯, 115 S.Ct. at 2489.

The shape of the Third District may be so bizarre that it can rationally be understood only as an effort to segregate voters on the basis of race. *Shaw*, 509 U.S. at ⎯⎯, 113 S.Ct. at 2826. At this stage of the litigation, however, I cannot say that it is. If I did, I would be engaging in the same conclusory reasoning that the majority employs. As the Supreme Court has explained, only in "rare" and "exceptional" *Gomillion*-like cases will a district's facial bizarreness give rise, without further evidence, to a racial gerrymander finding. *Miller*, ⎯⎯ U.S. at ⎯⎯, 115 S.Ct. at 2487. Consequently, at this stage of the litigation, I would deny the plaintiffs' summary judgment motions to the extent that they allege, pursuant to *Shaw*, that the shape of the Third District, without more, proves the existence of a racial gerrymander.

I would, however, permit the parties to engage in discovery on this claim. The products of discovery would provide this court with evidence that it could use to support its resolution of this issue. The parties could

secure affidavits or depose experts who could opine on such questions as: (1) whether the Third District is more or less bizarre than the districts at issue in *Shaw*, North Carolina's First and Twelfth Districts; (2) where the Third District ranks in terms of "bizarreness" with other congressional districts; and (3) ultimately, whether the shape of the Third District is so bizarre that it can rationally be understood only as a racial gerrymander. Again, allowing the parties to pursue discovery as to the plaintiffs' facial bizarreness claim would enable this court to provide substantial reasons for its decision, and not just conclusory assertions and quotations from newspaper editorials.

The majority also holds, in the alternative, that the *DeGrandy* opinion, the Special Master's Report, and the Independent Expert's Report show that "race was the predominating factor in the creation of District Three," and thus the plaintiffs are entitled to summary judgment pursuant to *Miller*.[9] A review of those documents, however, does not support the majority's holding.[10]

In drawing Florida's congressional districts, the *DeGrandy* court considered race among several variables. The court recognized that it had a constitutional obligation to achieve population equality among the districts. *See* 794 F.Supp. at 1084 ("To satisfy the one person-one vote requirement, this court must draw the congressional districts so that their populations are equal."); *see also* Special Master's Report at 8; Independent Expert's Report at 4, 8–9. The court also drew the districts in light of the principles of section 2 and section 5 of the Voting Rights Act. *See* 794 F.Supp. at 1083 ("[T]his court must consider in crafting the redistricting plan the section 2 requirement of ensuring that the plan does not dilute the votes of racial or language minorities.") and at 1084 ("This court should also consider issues of possible retrogression affecting the five Florida counties which come under the protection of section 5 of the Voting Rights Act."); *see also* Special Master's Report at 12 ("[A]ll the parties and amici curiae agree that section 2 must, at a minimum, *be considered* in crafting the redistricting plan.") and at 19–20; Independent Expert's Report at 10–13. The court also decided to draw contiguous districts. *See* 794 F.Supp. at 1084 ("Although no federal or state requirement that congressional districts be contiguous exists, contiguity is appropriate."); *see also* Independent Expert's Report at 14–15. Moreover, the court found that respecting traditional county boundaries was a "desirable approach." 794 F.Supp. at 1085; *see also* Independent Expert's Report at 16.[11]

Similarly, the court held that generating compact districts was "desirable." 794 F.Supp. at 1084. The court also found the prescriptions of *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), which, *inter alia*, require plaintiffs mounting a section 2 challenge to make a threshold showing that their group is sufficiently large and geographically compact to constitute a majority in a single-member district, "helpful." 794 F.Supp. at 1083. The court further stated that

> [t]he consideration of communities of interest is also relevant to the determination of compactness. If a district is so spread out that no sense of community exists, then that district is not sufficiently compact. However, members of a minority group who live in separate enclaves may still be included in a single district where it can be shown that they constitute a single community having similar interests.

---

9. The majority's analysis on this issue also spans one paragraph.

10. The appendices to the *DeGrandy* court's opinion, which include the Special Master's Report and the Independent Expert's Report, were not published along with the court's opinion, but are on file with the United States District Court for the Northern District of Florida. The *DeGrandy* court's opinion expressly incorporated the Special Master's and Independent Expert's Reports. 794 F.Supp. at 1090.

11. The Independent Expert's Report noted, however, that "[t]here is no requirement that traditional boundaries be followed in drawing congressional redistricting plans for Florida." *See In re Apportionment Law, Senate Joint Res. No. 1305*, 263 So.2d 797, 801 (Fla.1972) ("[T]here is no requirement that district lines follow precinct or county lines...."), *supplemented by*, 279 So.2d 14 (Fla.) *and* 281 So.2d 484 (Fla.1973).

794 F.Supp. at 1085 (citation omitted); *see also* Independent Expert's Report at 16–17. Critically, *the Special Master found that African-Americans residing in the Third District constituted a community of interest:*

> Several parties proposed districts in Northeast Florida which contained African-American majority [voting-age] populations. The evidence showed that due to the cohesiveness of the African-American population, African-Americans may constitute a community of interest even if they live in different municipalities. Therefore, an African-American majority district, such as the Independent Expert Plan's District 3, may spread over a number of counties without damaging a community of interest. Of course, there are a number of non-racial factors considered in the make-up of a community of interest, e.g., similar economic status, background and aspirations.

Special Master's Report at 27–28 (citations omitted).[12] Incredibly, the majority does not address this finding even though *Miller* directs that "[a] State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests." *Miller,* —— U.S. at ——, 115 S.Ct. at 2490. Finally, the *DeGrandy* court contemplated "maintaining party competitiveness" in adopting its redistricting plan. 794 F.Supp. at 1085; *see also* Independent Expert's Report at 17–18, 38–39.

In short, in drawing the congressional districts, the *DeGrandy* court considered numerous traditional, non-racial districting principles, including population equality, compliance with sections 2 and 5 of the Voting Rights Act, and the maintenance of contiguity, county boundaries, compactness, communities of interest, and political party competitiveness. Moreover, the court expressly found that the African-American population in the Third District constituted a community of interest. In addition, the court rejected two proposed redistricting plans because they included districts containing African-American populations that did not comprise communities of interest. In rejecting the Ireland plan, the court wrote:

> The ... plan's African-American majority district in central Florida is extremely long, irregularly shaped, and extends from Palm Beach County in south Florida to Volusia County in central Florida, and from St. Lucie County on the Atlantic Coast to Pinellas County on the Gulf Coast. This long, irregularly shaped district traverses parts of seventeen counties and involves three major media markets. The communities linked in this sprawling district are likely to have competing interests and do not constitute communities of interest.

794 F.Supp. at 1086. The court also rejected the *DeGrandy* plan because, *inter alia,* "the plan's sprawling [African-American] influence district in central Florida links together populations in the Tampa and Orlando areas likely to have competing interests." 794 F.Supp. at 1086. The majority addresses none of these factors, except when it admits that "[t]he *DeGrandy* court closely followed the dictates of the Voting Rights Act and traditional redistricting principles throughout th[e redistricting] process."

In sum, I cannot find, on the basis of the *DeGrandy* opinion, that race was the predominant factor motivating the three-judge court in drawing the Third District. I also believe, however, that genuine issues of material fact exist concerning this issue. These factual issues include: (1) whether the Third District is functionally compact; and (2) whether the *DeGrandy* court subordinated Florida's traditional race-neutral districting principles to racial considerations in drawing the Third District. Accordingly, *Miller* does not justify the granting of summary judgment for the plaintiffs on their racial gerrymander claim at this stage of the litigation.

I would also permit the parties to engage in discovery on this issue. The majority does not, however, because it believes "[t]he issue of whether District Three is a racially gerrymandered district turns on an examination of the *DeGrandy* court's motivations in creating

---

**12.** The "Independent Expert Plan's District 3" is now the Third District.

the Third District, as memorialized in the independent expert's report, Special Master's Report and Recommendation, and the *De-Grandy* decision itself." Though the majority is correct in asserting that this issue turns on the *DeGrandy* court's motivations, I fail to understand why only the three enumerated documents can be used to discern those motivations. The majority provides no legal support for this conclusion; indeed, the majority's decision to prohibit discovery on the plaintiffs' racial gerrymander claim contravenes the Supreme Court's directive that "courts ... exercise *extraordinary caution* in adjudicating claims that a state has drawn district lines on the basis of race." *Miller*, —— U.S. at ——, 115 S.Ct. at 2488 (emphasis added). It is not obvious to me why the parties should be precluded from engaging in discovery, which could involve, among other options, deposing the independent expert, or, for that matter, members of the *DeGrandy* court.[13] When parties challenge legislatively-drawn districts, they are not restricted to the four corners of legislative histories in attempting to discern a legislature's motives; rather, they depose legislators as a matter of practice. Courts permit this to occur, of course, because governmental actors do not always document their true motives. Therefore, if *Miller* applies to court-drawn districts, why should this court preclude the parties from looking beyond the *DeGrandy* court's judicial pronouncements?[14] In short, the majority's assertion that "[a]dditional discovery would not lead to any evidence that would create a material question of fact on this issue" is indefensible.[15]

In closing, I must state that I find the majority's approach troubling. This case in-

volves a challenge to a court-drawn congressional district. The majority gives short shrift to this fact (and the *DeWitt* precedent), which enables it to apply the less-deferential *Miller* standard. The majority, however, does not permit the parties to litigate fully the *Miller* claim—that would involve the parties questioning the responsible governmental actors about their motivations in drawing the Third District's lines. Instead, the majority restricts its *Miller* inquiry to three documents. I believe the majority does this because this case involves a challenge to a court-drawn district, and the majority realizes that allowing the parties to develop their contentions under *Miller* may lead to messy results (like federal judges being deposed about what their intentions were in drawing redistricting lines) that the majority wants to avoid. The majority, however, cannot have it both ways. If judicially-drawn districts are entitled to greater deference from reviewing courts than legislatively-drawn districts (and I believe they are), the *DeWitt* standard applies. If not, *Miller* applies, and the parties must be afforded the opportunity to litigate fully the issue of whether race was the predominant factor driving the *DeGrandy* court in drawing the Third District—even if that inquiry leads to consequences the majority dislikes.

The majority's granting of summary judgment to the plaintiffs on their racial gerrymander claim pursuant to *Shaw* and, in the alternative, *Miller*, without first affording the parties the opportunity to engage in discovery in this complex and important case, is a grave error.

For the foregoing reasons, I dissent.

---

**13.** Of course, granting such a discovery request could lead to the reconstitution of this panel because two members of this court participated on the *DeGrandy* court.

**14.** The majority's decision to foreclose discovery and decide the racial gerrymander claim based solely on the *DeGrandy* opinion is especially inappropriate given that the *DeGrandy* opinion *preceded Shaw* and *Miller*.

**15.** Because I disagree that "most of the undisputed material facts are contained in the *De-*

*Grandy* decision itself," I do not believe that the plaintiffs have "substantially complied" with local rule 56.1 solely by submitting a photocopy of the *DeGrandy* opinion to this court. Local rule 56.1 provides that "[a]ny motion for summary judgment ... shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion." N.D.Fla.Loc.R. 56.1(A).

APPENDIX A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Andrew E. JOHNSON, Thomas S. Bloodworth, Charles Henry Bloodworth, III, Bill Boyer, Frances Brown, Robert T. Conner, Harold F. Davis, Arthur Wilson Devoe, Robert Ellison, George Erdel, Paul Farley, Sue Hall, Hugh Milton Hays, Jr., Hugh Milton Hays, Sr., Carson Thomas Howes, Jr., Ron Jackson, Carolyn Janice Johnson, Coranell H. Johnson, Susan M. Lamb, Jim Lewis, Pat Mathis, Cynthia McKinney, Daniel McKinney, Jim Neill, Tommy Praeter, Charles Romero, Vicki T. Romero, and Dana Wine,

Plaintiffs,

vs.

Jim SMITH, in His Official Capacity as Secretary of the State of Florida; Pat Thomas, in His Official Capacity as President of the Florida Senate; and Bolley L. Johnson, in His Official Capacity as Speaker of the Florida House of Representatives,

Defendants.

CASE NO.: 94–40025

*COMPLAINT*

Plaintiffs, ANDREW E. JOHNSON, THOMAS S. BLOODWORTH, CHARLES HENRY BLOODWORTH, III, BILL BOYER, FRANCES BROWN, ROBERT T. CONNER, HAROLD F. DAVIS, ARTHUR WILSON DEVOE, ROBERT ELLISON, GEORGE ERDEL, PAUL FARLEY, SUE HALL, HUGH MILTON HAYS, JR., HUGH MILTON HAYS, SR., CARSON THOMAS HOWES, JR., RON JACKSON, CAROLYN JANICE JOHNSON, CORANELL H. JOHNSON, SUSAN M. LAMB, JIM LEWIS, PAT MATHIS, CYNTHIA MCKINNEY, DANIEL MCKINNEY, JIM NEILL, TOMMY PRAETER, CHARLES ROMERO, VICKI T. ROMERO, and DANA WINE sue the Defendant, JIM SMITH, SECRETARY OF THE STATE OF FLORIDA; PAT THOMAS, in his official capacity as PRESIDENT OF THE FLORIDA SENATE; and BOLLEY L. JOHNSON, in his official capacity as SPEAKER OF THE FLORIDA HOUSE OF REPRESENTATIVES, and allege:

1. This Court has jurisdiction over this cause pursuant to 28 U.S.C. Section 1343(1), (2), (3) and (4). This is a civil action to redress the deprivation of a right, privilege, or immunity secured by the Constitution of the United States pursuant to 42 USC Section 1985.

2. During the 1992 Congressional elections, the Plaintiff, ANDREW E. JOHNSON was a candidate for Congress in the United States Third Congressional District in the State of Florida, who resided in Jacksonville, Florida and who was and still is a registered voter in the State of Florida. At and during all times mentioned herein, the Plaintiffs, ANDREW E. JOHNSON, THOMAS S. BLOODWORTH, CHARLES HENRY BLOODWORTH, III, BILL BOYER, FRANCES BROWN, ROBERT T. CONNER, HAROLD F. DAVIS, ARTHUR WILSON DEVOE, ROBERT ELLISON, GEORGE ERDEL, PAUL FARLEY, SUE HALL, HUGH MILTON HAYS, JR., HUGH MILTON HAYS, SR., CARSON THOMAS HOWES, JR., RON JACKSON, CAROLYN JANICE JOHNSON, CORANELL H. JOHNSON, SUSAN M. LAMB, JIM LEWIS, PAT MATHIS, CYNTHIA MCKINNEY, DANIEL MCKINNEY, JIM NEILL, TOMMY PRAETER, CHARLES ROMERO, VICKI T. ROMERO, and DANA WINE were and still are residents of Duval, Clay, and St. Johns Counties, Florida and are citizens and registered voters in the State of Florida, all of whom are similarly situated as:

A. Residents in the 1992–1994 Third Congressional District, who have been deliberately relegated to minority voting status within the Third Congressional District by the 1992 redistricting plan, and/or

B. Residents of the State of Florida who live in districts which were created with the intent to separate voters into different districts on the basis of race.

3. At and during all times mentioned herein, the Defendant, JIM SMITH, was and still is the Secretary of State of Florida. As Secretary of State, Mr. SMITH is charged with administering elections to the United States Congress in the State of Florida. At and during all times mentioned herein, the Defendants, PAT THOMAS and BOLLEY L. JOHNSON are the President of the Florida Senate and Speaker of the Florida House of Representatives respectively and are charged by the Florida Constitution with responsibility for redistricting the Congressional districts after each decennial reapportionment.

4. On or about July 17, 1992, the State of Florida, in accordance with the opinion and order of the United States District Court, Northern District of Florida in the cases of *Miguel De Grandy, et al. vs. T.K. Wetherell,* TCA 92–40015–WS; *Florida State Conference of NAACP Branches vs. Chiles,* TCA No. 92–40131–WS; and *United States of America vs. State of Florida,* TCA–No. 92–40220–WS created a new Third Congressional District. A general layout map of the new Third Congressional District is attached hereto and incorporated herein as Exhibit "A".

5. The newly drawn Third Congressional District was created by assembling pockets of African–American voters from fourteen counties extending from Orlando through Jacksonville to Ocala. The African–American population in Northeast Florida is neither sufficiently large nor sufficiently geographically compact to constitute a single Congressional District without resorting to racial gerrymandering. Because of the manner in which the District was created, the Third Congressional District is not reasonably compact.

6. The new Third Congressional District cannot rationally be understood as anything other than an effort to separate voters into different districts on the basis of race.

7. The creation of the new Third Congressional District deprives each of the Plaintiffs of a right, privilege or immunity secured by the United States Constitution and partic-

ularly the Fourteenth and Fifteenth Amendments to the Constitution.

8. The Third Congressional District is objectionable because:

A. The creation of the District was not narrowly tailored to further a compelling governmental interest.

B. The shape of the District results in a political unit incapable of meaningful representation.

C. The District contains no coherent communities of shared interest and shows no respect for traditional political boundaries.

D. The District links together populations in Orlando, Daytona, and Jacksonville, likely to have competing interests.

E. The District lacks real and effective contiguity.

9. As a direct and proximate result of the creation of the 1992–1994 Third Congressional District in the State of Florida, the Plaintiffs have been deprived of equal protection under the law.

10. The Plaintiffs have retained the services of the firm of Sullivan & Boyd to represent them in this matter.

WHEREFORE, the Plaintiffs demand injunctive and other relief against the Defendant including, but not limited to the following:

A. The entry of an order setting aside the July 17, 1992 order of the United States District Court, Northern District of Florida in the cases of *Miguel De Grandy, et al. vs. T.K. Wetherell,* TCA 92–40015–WS; *Florida State Conference of NAACP Branches vs. Chiles,* TCA No. 92–40131–WS; and *United States of America vs. State of Florida,* TCA–No. 92–40220–WS for the reasons set out in the Supreme Court's ruling in *Shaw vs. Reno,* 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) and enjoining JIM SMITH, SECRETARY OF THE STATE OF FLORIDA from holding any future congressional elections based upon the 1992 redistricting plan set forth therein.

B. The entry of an order directing that the term of office of each member of the United States House of Representatives from

Florida who represents a district created under the 1992 redistricting plan, and each district created under such plan, shall expire at noon on the 3rd day of January, 1995, and such terms of office and such districts shall not be extended or carried over into the next Congress in any manner whatsoever.

C. The entry of an order compelling PAT THOMAS and BOLLEY L. JOHNSON as representatives of the Florida Legislature to redistrict the State of Florida in accordance with the principles established by the Supreme Court. ;

D. The entry of an order awarding the Plaintiffs reasonable attorneys fees plus prejudgment interest and costs.

> Respectfully submitted,
>
> SULLIVAN & BOYD
> G.J. ROD SULLIVAN, JR. P.A.
>
> /s/ G.J. Rod Sullivan
> G.J. Rod Sullivan, Jr.
> Florida Bar ID No. 356794
> Post Office Box 4519
> Jacksonville, FL 32201
> (904) 356–2050
> Attorney for Plaintiffs

## APPENDIX B

[Page 5 of August 31, 1994
unpublished order]

narrowly tailored to satisfy a compelling governmental interest, it is similarly prohibited to a United States District Court. If anything, Federal District Courts need to be more cognizant of the Constitutional prohibitions against racial classifications than State legislatures.

9. At the July 1, 1994 hearing on the parties' Motion for Summary Judgment, the Court was advised that the Florida Legislature desired the opportunity to redistrict the State should it be determined that any or all of Florida's Congressional Districts were unconstitutional racial gerrymanders. In response to the ruling of the Supreme Court in *Miller v. Johnson*, Peter Wallace, the speaker of the Florida House of Representatives called a press conference at which he indicated a willingness to move quickly on legislative redistricting and at which he suggested the necessity of calling a special session of the Florida Legislature in the fall of 1995 to consider legislative redistricting. There is little doubt that this Court does not want to the burdened with the process of legislatively redistricting the State of Florida on a second occasion during this decade. Consequently, rapid action on the movants' motion would most likely lead to legislative redistricting being resolved in the legislative forum rather than a judicial forum.

## APPENDIX C

[Page 8 of plaintiffs' motion for
summary judgment]

417, 98 S.Ct. 2493 (1977). After the impending elections are completed, the legislature is supposed to recommence its deliberations in an attempt to come up with a legislative redistricting plan.

The Florida Legislature in this case was prevented from enacting a replacement plan by paragraph 2 of the court's judgment which stated that plan 308 would not be merely a temporary plan but instead would be "the plan to be utilized in the 1992 Florida congressional elections and in Florida congressional elections thereafter." To this extent, the court appears tò have deviated from the limited authority to create court-drawn redistricting plans set out by the Supreme Court. It has also violated the principle of the separation of powers and has prevented the Florida Legislature from fulfilling its obligations under Article III, Section 3 of the Florida Constitution to redistrict the State after the decennial census. Any alternative adopted by the court should cure that initial defect in the Judgment by making any court-ordered redistricting plan a temporary measure pending legislative action.

Failing the enactment of a congressional districting plan, Congress has developed a procedure for holding elections. That procedure is set out in 2 U.S.C. Section 2a(c)(2). It requires

## APPENDIX D

[Pages 46–51 of discussion by plaintiffs' counsel of *Milliken* issue]

the evidence in this case clearly points to the fact that District 3 is a racial gerrymander either under the *Shaw* test or the *Miller* test.

Having established that it is a racial gerrymander, it is presumptively unconstitutional, and our inquiry should probably be able to end at that particular point. The reason for that is that this Court was never asked to develop a remedy other than to remedy population inequalities and the legislature's failure to draw the plan.

However, the United States and the Florida Secretary of State have argued in their briefs that this was, in effect, a remedial plan. And while it may have been remedial with regards to population inequalities and the legislature's failure to draw a plan, it was not, in our opinion, remedial as to the question of racial fairness.

The first element of the *Milliken* test is: Did the plan directly address a constitutional violation? There was no specific constitutional violation asserted, first of all, alleged in the complaints filed in this matter or asserted by the Court, other than the ones we've already discussed—population inequality and legislature's failure to draw a plan.

Population inequality could very easily have been resolved and is resolved every ten years without resorting to racial gerrymandering. So, consequently, the racial gerrymandering remedy is not necessary to address the question of population inequality. Similarly, the legislature redraws the districts every ten years and does so without racial gerrymandering. Consequently, racial gerrymandering was not necessary to address the proposed or the alleged constitutional violation of the legislature's failure to draw a plan.

So, consequently, since the racial gerrymandering did not directly address a constitutional violation that's relevant, the racial gerrymander itself could not satisfy the criteria for a remedial plan.

Now, the Court does make a finding on Page 1079 of fourteen individual examples of official racial discrimination in the state of Florida that it asserts have influenced the Florida's electoral process. However, those generalized suggestions or examples of official racial discrimination are all remote in time. At the time that the Court issued its opinion, there were no more called poll taxes; there was no more prohibition against intermarriage between the races; there was no more official segregation on public buses; there were few, if any, remaining vestiges of school desegregation; there were no more white primaries; there were no more at-large voting schemes for congressional seats.

Consequently, while all of these examples did exist at one time, they do not exist and were not proved in the *De Grandy* litigation to have existed at the time that this Court was drafting its plan. Consequently, the plan, though it is remedial as to certain constitutional violations, is not remedial as to any of these particular examples of racial discrimination.

Secondly, the plan does not pass the second *Milliken* test as to remedial plans, which is: Does the remedy restore the victims of discrimination to the same position that they would have been in in the absence of discrimination?

In this particular case, there are fourteen counties that are within the Third Congressional District; however, none of those fourteen counties is within the pre-clearance requirements of the U.S. Department of Justice. Those counties are Collier, Hardee, Hendry, Hillsborough and Monroe, none of which are included in the Third Congressional District.

Furthermore, in the Third Congressional District many African–American candidates for public office had won in majority white districts. We have contacted the supervisor of elections in each of the fourteen counties and have found between 20 and 30 examples of where African–American candidates ran for school board races, county and circuit judgeships, city councils and county commissions in each of which they were elected in a majority white district by a majority of the votes.

Specifically, in Duval County, where Corrine Brown resides and where a number of the plaintiffs in this case reside, Earl M. Johnson had been elected in an at-large council seat against white opponents in Duval County on at least two occasions. More recently, Sheriff Glover was elected sheriff of Duval County—he is African–American—in an at-large election in Duval County. Gwenn Chandler Thompson, an African–American candidate for city council in a city council at-large race, similarly won.

So, consequently, there is no—in this case the remedy is not designed to address a specific constitutional violation.

Thirdly—

JUDGE HATCHETT: Mr. Sullivan, you combined your motions for this argument. We'll have to ask you to conclude in about six minutes.

MR. SULLIVAN: Your Honor, I'll even cut it shorter than that, I think. We have covered the majority of the points.

Let me say that the third element of the *Milliken* test is this: Does the remedy adequately take into account the interest of the state legislature managing state government?

Now, there is a case called *McDaniel versus Sanchez*, which dealt with the question of when the court can step in and create a districting plan where the legislature has failed to act, and I think particularly important in this particular case is Footnote 30 of that decision, which says that the court must give the legislature every opportunity to devise an acceptable plan.

Now, the factual situation in that case was where the court was developing a plan before elections had come forward, but we think the principle is equally applicable where the court develops a plan because of the imminence of the coming election. We think that to narrowly tailor any remedy or to satisfy the third element of the *Milliken* test, this Court would have to have made its congressional districting plan, Plan 308, an interim plan or a temporary plan; and that, as soon as the congressional elections were completed in 1992, the legislature should have been permitted the opportunity to go back, and, as a matter of fact, should have been ordered to go back, and attempt to legislatively redraw the districts.

And, consequently, that's what we are asking to happen here, is that the legislature, which has already filed in this case a stipulation to abate and to abide decree, has asked this Court for permission to redistrict the state of Florida, the congressional districts, in accordance with constitutional principles; and that they, therefore, should be granted that right because it is their responsibility under the Florida Constitution to do so. And I think that under the U.S. Constitution, it is this Court's responsibility to exercise all of its discretion in allowing the legislative redistricting process to go forward whenever possible.

So, just to summarize, Your Honor, in this case, the Third District is a racial gerrymander, presumptively unconstitutional. This particular plan, even though the defendants have argued that it is a remedial plan, was, in fact, remedial only as to the population violations and legislature's failure to draw a plan; and even if it were remedial, it would not pass strict scrutiny.

We would, therefore, ask the Court to refer this case—refer this redistricting process back to the state legislature.

JUDGE HATCHETT: Are there any other motions for you to argue today?

MR. SULLIVAN: Judge, there is a motion for a preliminary injunction, which, quite frankly, repeats a lot of the argument that was made in the motion for summary judgment.

The first element of that is that there is a substantial likelihood that we will prevail. The other three elements, I can address later without duplicating any of the